## THOMAS *v.* COLLINS, SHERIFF.

No. 14. Argued May 1, 1944. Reargued October 11, 1944.—
Decided January 8, 1945.

*Messrs. Lee Pressman* and *Ernest Goodman,* with whom *Mr. Eugene Cotton* was on the brief, on the original argument, and *Mr. Lee Pressman,* with whom *Mr. Ernest Goodman* was on the brief, on the reargument, for appellant.

*Mr. Fagan Dickson,* Assistant Attorney General of Texas, with whom *Mr. Grover Sellers,* Attorney General, was on the brief, for appellee.

By special leave of Court, on the reargument, *Mr. Alvin J. Rockwell,* with whom *Solicitor General Fahy* and *Miss Ruth Weyand* were on the brief, for the United States, as *amicus curiae,* contending that the provisions of the state law are inconsistent with the National Labor Relations Act.

Briefs were filed by *Mr. Nathan Witt* on behalf of the National Federation for Constitutional Liberties, and by *Messrs. Arthur Garfield Hays* and *Paul O'Dwyer* on behalf of the American Civil Liberties Union, as *amici curiae,* urging reversal.

Mr. Justice Rutledge delivered the opinion of the Court.

The appeal is from a decision of the Supreme Court of Texas which denied appellant's petition for a writ of habeas corpus and remanded him to the custody of appellee, as sheriff of Travis County. 141 Tex. 591, 174 S. W. 2d 958. In so deciding the court upheld, as against constitutional and other objections, appellant's commitment for contempt for violating a temporary restraining order issued by the District Court of Travis County. The order was issued *ex parte* and in terms restrained appellant, while in Texas, from soliciting members for or memberships in specified labor unions and others affiliated with the Congress of Industrial Organizations, without first obtaining an organizer's card as required by House Bill No. 100, c. 104, General and Special Laws of Texas, Regular Session, 48th Legislature (1943). After the order was served, appellant addressed a mass meeting of workers and at the end of his speech asked persons present to join a union. For this he was held in contempt, fined and sentenced to a short imprisonment.

The case has been twice argued here. Each time appellant has insisted, as he did in the state courts, that the statute as it has been applied to him is in contravention of the Fourteenth Amendment, as it incorporates the First, imposing a previous restraint upon the rights of freedom of speech and free assembly, and denying him the equal protection of the laws. He urges also that the application made of the statute is inconsistent with the provisions of the National Labor Relations Act, 49 Stat. 449, and other objections which need not be considered. For reasons to be stated we think the statute as it was applied in this case imposed previous restraint upon appellant's rights of free speech and free assembly and the judgment must be reversed.

The pertinent statutory provisions, §§ 5 and 12, are part of Texas' comprehensive scheme for regulating labor unions and their activities. They are set forth in the margin.[1]

---

[1] Sec. 5. "All labor union organizers operating in the State of Texas shall be required to file with the Secretary of State, before soliciting any members for his organization, a written request by United States mail, or shall apply in person for an organizer's card, stating (a) his name in full; (b) his labor union affiliations, if any; (c) describing his credentials and attaching thereto a copy thereof, which application shall be signed by him. Upon such applications being filed, the Secretary of State shall issue to the applicant a card on which shall appear the following: (1) the applicant's name; (2) his union affiliation; (3) a space for his personal signature; (4) a designation, 'labor organizer'; and, (5) the signature of the Secretary of State, dated and attested by his seal of office. Such organizer shall at all times, when soliciting members, carry such card, and shall exhibit the same when requested to do so by a person being so solicited for membership."

Sec. 12. "The District Courts of this State and the Judges thereof shall have full power, authority and jurisdiction, upon the application of the State of Texas, acting through an enforcement officer herein authorized, to issue any and all proper restraining orders, temporary or permanent injunctions, and any other and further writs or processes appropriate to carry out and enforce the provisions of this Act. Such proceedings shall be instituted, prosecuted, tried and heard as other civil proceedings of like nature in said Courts."

The Act also requires unions to file annual reports containing specified names and addresses, a statement of income and expenditure with the names of recipients, and copies of all contracts with employers which include a check-off clause. It prohibits charging dues which "will create a fund in excess of the reasonable requirements of such union," demanding or collecting any fee for the privilege to work and provides for liberal construction to prevent "excessive initiation fees." All officers, agents, organizers and representatives must be elected by at least a majority vote. Aliens and felons (unless restored to citizenship) cannot be "officers, officials . . . or labor organizers."

Additional enforcement provisions are found in § 11. A civil penalty not exceeding $1,000 is imposed "if any labor union violates any provision of this Act," to be recovered in a suit in the name of the State, instituted by authorized officers. Violation of the statute by a union

## I

The facts are substantially undisputed. The appellant, Thomas, is the president of the International Union U. A. W. (United Automobile, Aircraft and Agricultural Implements Workers) and a vice president of the C. I. O. His duties are manifold, but in addition to executive functions they include giving aid and direction in organizing campaigns and by his own statement soliciting members, generally or in particular instances, for his organizations and their affiliated unions. He receives a fixed annual salary as president of the U. A. W., resides in Detroit, and travels widely through the nation in performing his work.

O. W. I. U. (Oil Workers Industrial Union), a C. I. O. affiliate, is the parent organization of many local unions in Texas, having its principal office in Fort Worth. One of these is Local No. 1002, with offices in Harris County and membership consisting largely of employees of the Humble Oil & Refining Company's plant at Bay Town, Texas, not far from Houston. During and prior to September, 1943, C. I. O. and O. W. I. U. were engaged in a campaign to organize the employees at this plant into Local No. 1002, after an order previously made by the National Labor Relations Board for the holding of an election. As part of the campaign a mass meeting was arranged for the evening of September 23, under the

officer or labor organizer is made a misdemeanor, punishable by fine of not over $500 or confinement in the county jail for not to exceed 60 days, or both.

By § 2 (c), " 'labor organizer' shall mean any person who for a pecuniary or financial consideration solicits memberships in a labor union or members for a labor union." Under the interpretation promulgated by the Secretary of State, "Any person who solicits memberships for a union and receives remuneration therefor, will be considered a 'labor organizer' . . . Solicitation of memberships as an incident to other duties for which a salary is paid will be considered solicitation for remuneration."

auspices of O. W. I. U., at the city hall in Pelly, Harris County, near the Bay Town plant. Wide publicity was given to the meeting beforehand. Arrangements were made for Thomas to come to Texas to address it and wide notice was given to his announced intention of doing so.

Thomas arrived in Houston the evening of September 21. He testified without contradiction that his only object in coming to Houston was to address this meeting, that he did not intend to remain there afterward and that he had return rail reservations for leaving the State within two days. At about 2:30 o'clock on the afternoon of Thursday, September 23, only some six hours before he was scheduled to speak, Thomas was served with the restraining order and a copy of the fiat.

These had been issued *ex parte* by the District Court of Travis County (which sits at Austin, the state capital, located about 170 miles from Houston) on the afternoon of September 22, in a proceeding instituted pursuant to § 12 by the State's attorney general. The petition for the order shows on its face it was filed in anticipation of Thomas' scheduled speech.[2] And the terms of the order show that it was issued in anticipation of the meeting and the speech.[3]

---

[2] The petition recites the time and place of the mass meeting, that Thomas was scheduled to speak and would solicit members for the union at the meeting without an organizer's card. The recitals were based on an alleged previous announcement by him of intention to do these things, which at the hearing he denied having made. The petition stated there was "not sufficient time before the defendant makes the threatened speech" for notice to be served and returned and concludes with a prayer for the restraining order.

[3] The order repeated substantially the recitals of the petition, concerning the meeting, Thomas' scheduled speech and intention to solicit members, as grounds for its issuance appearing from "the sworn petition and statements of counsel," and enjoined Thomas from soliciting memberships in and members for Local No. 1002 and any other union affiliated with the C. I. O., while in Texas, without first obtaining an organizer's card.

Upon receiving service, Thomas consulted his attorneys and determined to go ahead with the meeting as planned. He did so because he regarded the law and the citation as a restraint upon free speech and free assembly in so far as they prevented his making a speech or asking someone to join a union without having a license or organizer's card at the time.

Accordingly, Thomas went to the meeting, arriving about 8:00 p. m., and, with other speakers, including Massengale and Crossland, both union representatives, addressed an audience of some 300 persons. The meeting was orderly and peaceful. Thomas, in view of the unusual circumstances, had prepared a manuscript originally intended, according to his statement, to embody his entire address. He read the manuscript to the audience. It discussed, among other things, the State's effort, as Thomas conceived it, to interfere with his right to speak and closed with a general invitation to persons present not members of a labor union to join Local No. 1002 and thereby support the labor movement throughout the country. As written, the speech did not address the invitation to any specific individual by name or otherwise.[4] But Thomas testified that he added, at the conclusion of the written speech, an oral solicitation of one Pat

---

[4] According to the report of the speech given in the record, it refers to Thomas' invitation to speak at the meeting, his acceptance, and his intention to discuss why workers should join the union and to urge those present to do so. After stating he had learned, on arrival, that his right to make such a speech was questioned, he said: "I didn't come here to break the law. I came here to make this speech and to ask you to join the union. But since the issue has arisen I don't want anybody to say that I'm evading it . . . to have an opening to get out without making a test of this law. . . . Therefore as Vice President of the C. I. O. and as a union man, I earnestly ask those of you who are not now members of the Oil Workers International Union to join now. I solicit you to become a member of the union of your fellow workers and thereby join hands with labor throughout this country in all industries. . . ."

O'Sullivan, a nonunion man in the audience whom he previously had never seen.[5]

After the meeting Thomas, with two of the other union speakers, was arrested and taken before a justice of the peace. Complaints were filed in criminal proceedings, presumably pursuant to § 11. Thomas was released on bond, returned to his hotel, and the next morning left for Dallas. There he learned an attachment for his arrest had been issued at Austin by the Travis County District Court, pursuant to the attorney general's motion filed that morning in contempt proceedings for violation of the temporary restraining order.[6]

On the evening of September 24, Thomas went to Austin for the hearing upon the temporary injunction set for the morning of the 25th. At this time he appeared and moved for dismissal of the complaint, for dissolution of the temporary restraining order, and to quash the contempt proceeding. The motions were denied and, after hearing, the court ordered the temporary injunction to issue. It also rendered judgment holding Thomas in contempt for vio-

---

[5] Thomas testified his invitation to O'Sullivan was as follows: "I said, 'Pat O'Sullivan, I want you to join the Oil Workers Union. I have some application cards here, and I would like to have you sign one.' I went on from there and I asked everybody in the crowd who was not a member of the organization to come up and if it was necessary I would personally sign him to these application cards."

Thomas' account of what occurred at the meeting is subtantiated by the testimony of Jesse Owens, Assistant Attorney General of Texas, who was present.

[6] The motion recited that Thomas "(1) . . . did at said time and place solicit Pat O'Sullivan . . . to join a local union" of O. W. I. U. and "(2) At said time and place . . . did *openly and publicly solicit an audience of approximately 300 persons* . . . to then and there join and become members" of O. W. I. U., charged that "*the acts of R. J. Thomas above alleged were* in open and flagrant violation" of the court's order and writ and alleged that "*said acts* constitute contempt of this court and should be punished by appropriate order." (Emphasis added.)

lating the restraining order and fixed the penalty at three days in jail and a fine of $100. Process for commitment thereupon issued and was executed. Application to the supreme court for the writ of habeas corpus was made and granted, the cause was set for hearing in October, and Thomas was released on bond, all on September 25. Thereafter, an amended application in habeas corpus was filed, hearing on the cause was had, judgment was rendered sustaining the commitment, a motion for rehearing was overruled, and the present appeal was perfected. Argument followed here at the close of the last term, with reargument at the beginning of the present one to consider questions upon which we desired further discussion.

## II

The Supreme Court of Texas, deeming habeas corpus an appropriate method for challenging the validity of the statute as applied,[7] sustained the Act as a valid exercise of the State's police power, taken "for the protection of the general welfare of the public, and particularly the laboring class," with special reference to safeguarding laborers from imposture when approached by an alleged organizer. The provision, it was said, "affects only the right of one to engage in the business as a paid organizer, and not the mere right of an individual to express his views on the merits of the union." The court declared the Act "does not require a paid organizer to secure a license," but makes mandatory the issuance of the card "to all who come within the provisions of the Act upon their

---

[7] The court reviewed the contempt commitment over appellee's strenuous jurisdictional objections. Since the state court has determined the validity of the statute and its application in the habeas corpus proceeding, as against the objections on federal constitutional grounds, those questions are properly here on this appeal. *Bryant* v. *Zimmerman*, 278 U. S. 63. The State concedes this.

good-faith compliance therewith." Accordingly it held
that the regulation was not unreasonable.

The court conceded however that the Act "interferes
to a certain extent with the right of the organizer to speak
as the paid representative of the union." Nevertheless,
it said, "such interferences are not necessarily prohibited
by the Constitution. The State under its police power
may enact laws which interfere indirectly and to a limited
extent with the right of speech or the liberty of the people
where they are reasonably necessary for the protection
of the general public." Accordingly, it likened the instant
prohibition to various other ones imposed by state or fed-
eral legislation upon "the right of one to operate or speak
as the agent of another," including securities salesmen,
insurance agents, real estate brokers, etc. And various
decisions of this Court and others [8] were thought to sup-
port the conclusion that the Act "imposes no previous
general restraint upon the right of free speech. . . . It
merely requires paid organizers to register with the Sec-
retary of State before beginning to operate as such."

## III

Appellant first urges that the application of the statute
amounted to the requirement of a license "for the simple
act of delivering an address to a group of workers." He
says the act penalized "was simply and solely the act of
addressing the workers on the . . . benefits of unionism,
and concluding the address with a plea to the audience
generally and to a named worker in the audience to join
a union." He points out that he did not parade on the
streets, did not solicit or receive funds, did not "sign up"

---

[8] *Cantwell* v. *Connecticut*, 310 U. S. 296; *Cox* v. *New Hampshire*,
312 U. S. 569; *City of Manchester* v. *Leiby*, 117 F. 2d 661.

workers,[9] engaged in no disturbance or breach of the peace, and that his sole purpose in going to Texas and his sole activity there were to make the address including the invitations which he extended at the end. There is no evidence that he solicited memberships or members for a union at any other time or occasion or intended to do so. His position necessarily maintains that the right to make the speech includes the right to ask members of the audience, both generally and by name, to join the union.

Appellant also urges more broadly that the statute is an invalid restraint upon free expression in penalizing the mere asking a worker to join a union, without having procured the card, whether the asking takes place in a public assembly or privately.

Texas, on the other hand, asserts no issue of free speech or free assembly is presented. With the state court, it says the statute is directed at business practices, like selling insurance, dealing in securities, acting as commission merchant, pawnbroking, etc., and was adopted "in recognition of the fact that something more is done by a labor organizer than talking." [10]

Alternatively, the State says, § 5 would be valid if it were framed to include voluntary, unpaid organizers and if no element of business were involved in the union's activity. The statute "is a registration statute and nothing more," and confers only "ministerial and not discretionary powers" upon the Secretary of State. The requirement accordingly is regarded as one merely for previous identification, valid within the rule of *City of Manchester* v.

---

[9] However, the record shows he offered to sign the application blanks or cards "if it was necessary." Cf. note 5 *supra*.

[10] "He acts for an alleged principal and collects money for the principal, or if he does not actually collect fees and dues in person, he makes it possible for his principal to collect them. He purports to act for a labor union in establishing a contractual relation. . . ." The statements are taken from the brief.

*Leiby,* 117 F. 2d 661, and the dictum of *Cantwell* v. *Connecticut,* 310 U. S. 296, 306.[11]

In accordance with their different conceptions of the nature of the issues, the parties would apply different standards for determining them. Appellant relies on the rule which requires a showing of clear and present danger to sustain a restriction upon free speech or free assembly.[12] Texas, consistently with its "business practice" theory, says the appropriate standard is that applied under the commerce clause to sustain the applications of state statutes regulating transportation made in *Hendrick* v. *Maryland,* 235 U. S. 610; *Clark* v. *Paul Gray, Inc.,* 306 U. S. 583; and *California* v. *Thompson,* 313 U. S. 109.[13] In short, the State would apply a "rational basis" test,

---

[11] "Without doubt a State may protect its citizens *from fraudulent solicitation* by requiring a stranger in the community, before permitting him publicly *to solicit funds* for any purpose, to establish his identity and his authority to act for the cause which he purports to represent," (emphasis added) citing for comparison *Lewis Publishing Co.* v. *Morgan,* 229 U. S. 288, 306–310; *Bryant* v. *Zimmerman,* 278 U. S. 63, 72. Cf. text *infra* at note 23.

[12] Cf. *Schenck* v. *United States,* 249 U. S. 47; Mr. Justice Holmes dissenting in *Abrams* v. *United States,* 250 U. S. 616, 624 and in *Gitlow* v. *New York,* 268 U. S. 652, 672; *Bridges* v. *California,* 314 U. S. 252. A recent statement is that made in *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624, 639: "The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect."

[13] According to the brief, "The analogy is that *interstate commerce like freedom of religion, speech and press* is protected from undue burdens imposed by the States, yet the States still have authority to impose regulations which are reasonable in relation to the subject." (Emphasis added.)

appellant one requiring a showing of "clear and present danger."

Finally, as the case is presented here, Texas apparently would rest the validity of the judgment exclusively upon the specific individual solicitation of O'Sullivan, and would throw out of account the general invitation, made at the same time, to all nonunion workers in the audience.[14] However, the case cannot be disposed of on such a basis. The Texas Supreme Court made no distinction between the general and the specific invitations.[15] Nor did the District Court. The record shows that the restraining order was issued in explicit anticipation of the speech and to restrain Thomas from uttering in its course any language which could be taken as solicitation.[16] The motion for the fiat in contempt was filed and the fiat itself was is-

---

[14] The argument, both at the bar and in the brief, has been indefinite in this respect. It has neither conceded nor unequivocally denied that the sentence was imposed on account of both acts. Nevertheless the State maintains that the invitation to O'Sullivan in itself is sufficient to sustain the judgment and sentence and that nothing more need be considered to support them.

[15] That the court regarded the violation as consisting of both acts appears from the statement in the opinion that Thomas "violated the terms of the injunction by soliciting members for said union without having first registered . . ." The plural could have been used only if the general platform plea were considered as being one of the violations restrained and punished.

[16] The *ex parte* petition for the order was founded solely upon the allegation, based only upon rumor as later appeared from Thomas' uncontradicted testimony, that he intended to address the meeting and in the course of his speech generally to solicit nonunion men present to join the union. Cf. note 2 *supra*. When the petition was filed and the restraining order was issued and served, it was not possible to specify anticipated individual solicitations and consequently only anticipated general ones could be and were relied upon. The order therefore must be taken to have been intended to reach exactly what it was requested to get at. Cf. note 3 *supra;* and text *infra* at note 20 ff.

sued on account of both invitations.[17] The order adjudging Thomas in contempt was in general terms, finding that he had violated the restraining order, without distinction between the solicitations set forth in the petition and proved as violations.[18] The sentence was a single penalty. In this state of the record it must be taken that the order followed the prayer of the motion and the fiat's recital, and that the penalty was imposed on account of both invitations. The judgment therefore must be affirmed as to both or as to neither. Cf. *Williams* v. *North Carolina*, 317 U. S. 287, 292; *Stromberg* v. *California*, 283 U. S. 359, 368. And it follows that the statute, as it was applied, restrained and punished Thomas for uttering, in the course of his address, the general as well as the specific invitation.

## IV

The case confronts us again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins. Choice on that border, now as always delicate, is perhaps more so where the

---

[17] The motion after reciting the solicitation of O'Sullivan and adding that Thomas "did openly and publicly solicit an audience of approximately 300 persons . . . ," claimed both acts as being "in open and flagrant violation of the order of this court" and as contempt, and sought punishment for them.

[18] The order made the usual formal recitals concerning the previous proceedings, the parties' appearance and the court's "having heard the pleadings and evidence." It then, without stating the particular acts in which the contempt consisted, cf. note 17 *supra*, found generally that Thomas "did in Harris County, Texas, on the 23d day of September A. D. 1943, violate this court's temporary restraining order heretofore issued injoining and restraining him . . . from soliciting members to join" the O. W. I. U. without obtaining an organizer's card, adjudged him guilty of contempt "for the violation of the law and of the order of this court on the 23d day of September, A. D. 1943," and assessed the punishment as stated above.

usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. Cf. *Schneider* v. *State*, 308 U. S. 147; *Cantwell* v. *Connecticut*, 310 U. S. 296; *Prince* v. *Massachusetts*, 321 U. S. 158. That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the right, not of the limitation, which determines what standard governs the choice. Compare *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152–153.

For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger.[19] The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation. Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation. It is therefore in our tradition to allow the widest room for discussion, the narrowest range for its restriction, particularly when this right is exercised in conjunction with peaceable assembly. It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate rights, cf. *De Jonge* v. *Oregon*, 299 U. S. 353, 364, and therefore are united in the First Article's assurance. Cf. 1 Annals of Congress 759–760.

---

[19] Cf. note 12 *supra*.

This conjunction of liberties is not peculiar to religious activity and institutions alone. The First Amendment gives freedom of mind the same security as freedom of conscience. Cf. *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Meyer* v. *Nebraska,* 262 U. S. 390; *Prince* v. *Massachusetts,* 321 U. S. 158. Great secular causes, with small ones, are guarded. The grievances for redress of which the right of petition was insured, and with it the right of assembly, are not solely religious or political ones. And the rights of free speech and a free press are not confined to any field of human interest.

The idea is not sound therefore that the First Amendment's safeguards are wholly inapplicable to business or economic activity. And it does not resolve where the line shall be drawn in a particular case merely to urge, as Texas does, that an organization for which the rights of free speech and free assembly are claimed is one "engaged in business activities" or that the individual who leads it in exercising these rights receives compensation for doing so. Nor, on the other hand, is the answer given, whether what is done is an exercise of those rights and the restriction a forbidden impairment, by ignoring the organization's economic function, because those interests of workingmen are involved or because they have the general liberties of the citizen, as appellant would do.

These comparisons are at once too simple, too general, and too inaccurate to be determinative. Where the line shall be placed in a particular application rests, not on such generalities, but on the concrete clash of particular interests and the community's relative evaluation both of them and of how the one will be affected by the specific restriction, the other by its absence. That judgment in the first instance is for the legislative body. But in our system where the line can constitutionally be placed presents a question this Court cannot escape answering independently, whatever the legislative judgment, in the

light of our constitutional tradition. *Schneider* v. *State,* 308 U. S. 147, 161. And the answer, under that tradition, can be affirmative, to support an intrusion upon this domain, only if grave and impending public danger requires this.

That the State has power to regulate labor unions with a view to protecting the public interest is, as the Texas court said, hardly to be doubted. They cannot claim special immunity from regulation. Such regulation however, whether aimed at fraud or other abuses, must not trespass upon the domains set apart for free speech and free assembly. This Court has recognized that "in the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. . . . Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society." *Thornhill* v. *Alabama,* 310 U. S. 88, 102–103; *Senn* v. *Tile Layers Protective Union,* 301 U. S. 468, 478. The right thus to discuss, and inform people concerning, the advantages and disadvantages of unions and joining them is protected not only as part of free speech, but as part of free assembly. *Hague* v. *C. I. O.,* 307 U. S. 496. The Texas court, in its disposition of the cause, did not give sufficient weight to this consideration, more particularly by its failure to take account of the blanketing effect of the prohibition's present application upon public discussion and also of the bearing of the clear and present danger test in these circumstances.

## V

In applying these principles to the facts of this case we put aside the broader contentions both parties have made and confine our decision to the narrow question

whether the application made of § 5 in this case contravenes the First Amendment.

The present application does not involve the solicitation of funds or property. Neither § 5 nor the restraining order purports to prohibit or regulate solicitation of funds, receipt of money, its management, distribution, or any other financial matter. Other sections of the Act deal with such things.[20] And on the record Thomas neither asked nor accepted funds or property for the union at the time of his address or while he was in Texas. Neither did he "take applications" for membership, though he offered to do so "if it was necessary"; or ask anyone to join a union at any other time than the occasion of the Pelly mass meeting and in the course of his address.

Thomas went to Texas for one purpose and one only—to make the speech in question. Its whole object was publicly to proclaim the advantages of workers' organization and to persuade workmen to join Local No. 1002 as part of a campaign for members. These also were the sole objects of the meeting. The campaign, and the meeting, were incidents of an impending election for collective bargaining agent, previously ordered by national authority pursuant to the guaranties of national law. Those guaranties include the workers' right to organize freely for collective bargaining. And this comprehends whatever may be appropriate and lawful to accomplish and maintain such organization. It included, in this case, the right to designate Local No. 1002 or any other union or agency as

---

[20] See note 1 *supra*. According to the State's concession, Thomas might have made speeches "lauding unions and unionism" throughout Texas without violating the statute or the order. And at each address he could have taken a collection or sought and received contributions for the union, or for himself, without running afoul their prohibitions; that is, always if in doing so he avoided using words of invitation to unorganized workers to join a C. I. O. union.

the employees' representative. It included their right fully and freely to discuss and be informed concerning this choice, privately or in public assembly. Necessarily correlative was the right of the union, its members and officials, whether residents or nonresidents of Texas and, if the latter, whether there for a single occasion or sojourning longer, to discuss with and inform the employees concerning matters involved in their choice. These rights of assembly and discussion are protected by the First Amendment. Whatever would restrict them, without sufficient occasion, would infringe its safeguards. The occasion was clearly protected. The speech was an essential part of the occasion, unless all meaning and purpose were to be taken from it. And the invitations, both general and particular, were parts of the speech, inseparable incidents of the occasion and of all that was said or done.

That there was restriction upon Thomas' right to speak and the rights of the workers to hear what he had to say, there can be no doubt. The threat of the restraining order, backed by the power of contempt, and of arrest for crime, hung over every word. A speaker in such circumstances could avoid the words "solicit," "invite," "join." It would be impossible to avoid the idea. The statute requires no specific formula. It is not contended that only the use of the word "solicit" would violate the prohibition. Without such a limitation, the statute forbids any language which conveys, or reasonably could be found to convey, the meaning of invitation. That Thomas chose to meet the issue squarely, not to hide in ambiguous phrasing, does not counteract this fact. General words create different and often particular impressions on different minds. No speaker, however careful, can convey exactly his meaning, or the same meaning, to the different members of an audience. How one might "laud unionism," as the State and the State Supreme Court concede Thomas was free to do, yet in these circumstances not imply an invitation,

is hard to conceive. This is the nub of the case, which the State fails to meet because it cannot do so. Workingmen do not lack capacity for making rational connections. They would understand, or some would, that the president of U. A. W. and vice president of C. I. O., addressing an organization meeting, was not urging merely a philosophic attachment to abstract principles of unionism, disconnected from the business immediately at hand. The feat would be incredible for a national leader, addressing such a meeting, lauding unions and their principles, urging adherence to union philosophy, not also and thereby to suggest attachment to the union by becoming a member.

Furthermore, whether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.

Such a distinction offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim. He must take care in every word to create no impression that he means, in advocating unionism's most central principle, namely, that workingmen should unite for collective bargaining, to urge those present to do so. The vice is not merely that invitation, in the circumstances shown here, is speech. It is also that its prohibition forbids or restrains discussion which is not or may not be invitation. The sharp line cannot be drawn surely or securely. The effort to observe it could not be free speech, free press,

or free assembly, in any sense of free advocacy of principle or cause. The restriction's effect, as applied, in a very practical sense was to prohibit Thomas not only to solicit members and memberships, but also to speak in advocacy of the cause of trade unionism in Texas, without having first procured the card. Thomas knew this and faced the alternatives it presented. When served with the order he had three choices: (1) to stand on his right and speak freely; (2) to quit, refusing entirely to speak; (3) to trim, and even thus to risk the penalty. He chose the first alternative. We think he was within his rights in doing so.

The assembly was entirely peaceable, and had no other than a wholly lawful purpose. The statements forbidden were not in themselves unlawful, had no tendency to incite to unlawful action, involved no element of clear and present, grave and immediate danger to the public welfare. Moreover, the State has shown no justification for placing restrictions on the use of the word "solicit." We have here nothing comparable to the case where use of the word "fire" in a crowded theater creates a clear and present danger which the State may undertake to avoid or against which it may protect. *Schenck* v. *United States,* 249 U. S. 47. We cannot say that "solicit" in this setting is such a dangerous word. So far as free speech alone is concerned, there can be no ban or restriction or burden placed on the use of such a word except on showing of exceptional circumstances where the public safety, morality or health is involved or some other substantial interest of the community is at stake.

If therefore use of the word or language equivalent in meaning was illegal here, it was so only because the statute and the order forbade the particular speaker to utter it. When legislation or its application can confine labor leaders on such occasions to innocuous and abstract discussion of the virtues of trade unions and so becloud even this

with doubt, uncertainty and the risk of penalty, freedom of speech for them will be at an end. A restriction so destructive of the right of public discussion, without greater or more imminent danger to the public interest than existed in this case, is incompatible with the freedoms secured by the First Amendment.

We do not mean to say there is not, in many circumstances, a difference between urging a course of action and merely giving and acquiring information. On the other hand, history has not been without periods when the search for knowledge alone was banned. Of this we may assume the men who wrote the Bill of Rights were aware. But the protection they sought was not solely for persons in intellectual pursuits. It extends to more than abstract discussion, unrelated to action. The First Amendment is a charter for government, not for an institution of learning. "Free trade in ideas" means free trade in the opportunity to persuade to action, not merely to describe facts. Cf. *Abrams* v. *United States,* 250 U. S. 616, 624, and *Gitlow* v. *New York,* 268 U. S. 652, 672, dissenting opinions of Mr. Justice Holmes. Indeed, the whole history of the problem shows it is to the end of preventing action that repression is primarily directed and to preserving the right to urge it that the protections are given.

Accordingly, decision here has recognized that employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty. *Labor Board* v. *Virginia Electric & Power Co.,* 314 U. S. 469. Decisions of other courts have done likewise.[21] When to this persuasion other things are added which bring about coercion, or give it that character, the

---

[21] *Labor Board* v. *Ford Motor Co.,* 114 F. 2d 905 (C. C. A.); *Labor Board* v. *American Tube Bending Co.,* 134 F. 2d 993 (C. C. A.); compare *Texas & N. O. R. Co.* v. *Brotherhood of Clerks,* 281 U. S. 548, 568.

limit of the right has been passed.[22]  Cf. *Labor Board* v. *Virginia Electric & Power Co., supra.*  But short of that limit the employer's freedom cannot be impaired.  The Constitution protects no less the employees' converse right. Of course espousal of the cause of labor is entitled to no higher constitutional protection than the espousal of any other lawful cause.  It is entitled to the same protection.

## VI

Apart from its "business practice" theory, the State contends that § 5 is not inconsistent with freedom of speech and assembly, since this is merely a previous iden- tification requirement which, according to the state court's decision, gives the Secretary of State only "minis- terial, not discretionary" authority.

How far the State can require previous identification by one who undertakes to exercise the rights secured by the First Amendment has been largely undetermined.  It has arisen here chiefly, though only tangentally, in connection with license requirements involving the solicitation of funds, *Cantwell* v. *Connecticut, supra;* cf. *Schneider* v. *State,* 308 U. S. 147; *Largent* v. *Texas,* 318 U. S. 418, and other activities upon the public streets or in public places, cf. *Lovell* v. *Griffin,* 303 U. S. 444; *Hague* v. *C. I. O.,* 307 U. S. 496, or house-to-house canvassing, cf. *Schneider* v. *State, supra.*  In these cases, however, the license re- quirements were for more than mere identification or pre- vious registration and were held invalid because they vested discretion in the issuing authorities to censor the activity involved.  Nevertheless, it was indicated by

_____

[22] *Labor Board* v. *Trojan Powder Co.,* 135 F. 2d 337 (C. C. A.); *Labor Board* v. *New Era Die Co.,* 118 F. 2d 500; cf. *Labor Board* v. *Friedman-Harry Marks Clothing Co.,* 301 U. S. 58; *International As- sociation of Machinists* v. *Labor Board,* 311 U. S. 72.  Compare *Texas & N. O. R. Co.* v. *Brotherhood of Clerks,* 281 U. S. 548.

dictum in *Cantwell* v. *Connecticut,* 310 U. S. 296, 306,[23] that a statute going no further than merely to require previous identification would be sustained in respect to the activities mentioned. Although those activities are not involved in this case, that dictum and the decision in *Bryant* v. *Zimmerman,* 278 U. S. 63, furnish perhaps the instances of pronouncement or decision here nearest this phase of the question now presented.

As a matter of principle a requirement of registration in order to make a public speech would seem generally incompatible with an exercise of the rights of free speech and free assembly. Lawful public assemblies, involving no element of grave and immediate danger to an interest the State is entitled to protect, are not instruments of harm which require previous identification of the speakers. And the right either of workmen or of unions under these conditions to assemble and discuss their own affairs is as fully protected by the Constitution as the right of businessmen, farmers, educators, political party members or others to assemble and discuss their affairs and to enlist the support of others.

We think the controlling principle is stated in *De Jonge* v. *Oregon,* 299 U. S. 353, 365. In that case this Court held that, "consistently with the Federal Constitution, peaceable assembly for lawful discussion cannot be made a crime." And "those who assist in the conduct of such meetings cannot be branded as criminals on that score. The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects. If the persons assembling have committed crimes elsewhere, if they have formed or are

---

[23] Cf. note 11 *supra.*

engaged in a conspiracy against the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge."

If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them and making such a condition the foundation for restraining in advance their exercise and for imposing a penalty for violating such a restraining order. So long as no more is involved than exercise of the rights of free speech and free assembly, it is immune to such a restriction. If one who solicits support for the cause of labor may be required to register as a condition to the exercise of his right to make a public speech, so may he who seeks to rally support for any social, business, religious or political cause. We think a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment.

Once the speaker goes further, however, and engages in conduct which amounts to more than the right of free discussion comprehends, as when he undertakes the collection of funds or securing subscriptions, he enters a realm where a reasonable registration or identification requirement may be imposed. In that context such solicitation would be quite different from the solicitation involved here. It would be free speech plus conduct akin to the activities which were present, and which it was said the State might regulate, in *Schneider* v. *State, supra,* and *Cantwell* v. *Connecticut, supra.* That, however, must be

done, and the restriction applied, in such a manner as not to intrude upon the rights of free speech and free assembly. In this case the separation was not maintained. If what Thomas did, in soliciting Pat O'Sullivan, was subject to such a restriction, as to which we express no opinion, that act was intertwined with the speech and the general invitation in the penalty which was imposed for violating the restraining order. Since the penalty must be taken to have rested as much on the speech and the general invitation as on the specific one, and the former clearly were immune, the judgment cannot stand.

As we think the requirement of registration, in the present circumstances, was in itself an invalid restriction, we have no occasion to consider whether the restraint as imposed goes beyond merely requiring previous identification or registration.[24] Nor do we undertake to determine

---

[24] In securing the detailed information § 5 requires, cf. note 1 *supra*, the Secretary of State has established an administrative routine for compliance, which includes a form of application requiring the applicant to state: (1) his name; (2) his address; (3) his labor union affiliations ("specify definitely and fully"); (4) that "as evidence of my authority to act as Labor Organizer for the labor union with which I am connected, I am furnishing the following credentials"; (5) a copy of such credentials; (6) that he is a citizen of the United States of America; (7) whether he has ever been convicted of a felony in Texas or in any other State; and (a) if so, the nature of the offense and the State in which conviction was had; (b) whether his rights of citizenship have been fully restored; and (c) by what authority.

The Secretary of State testified that cards were issued as of course if the application blanks were properly filled in. But in his interpretative statement, issued to the general public, he said: *"In the absence of mistake, fraud or misrepresentation* with respect to securing same, it is considered that the Secretary of State has no discretion in the granting of an 'organizer's card,' and that the applicant will be entitled to same upon compliance with the Act. *It will be required,* however, that the applicant *show a bona fide affiliation* with an existing labor union." (Emphasis added.) Precisely what "credentials" or evidence in con-

the validity of § 5 in any other application than that made upon the facts of this case. Neither do we ground our decision upon other contentions advanced in the briefs and argument. Upon the reargument attention was given particularly to the questions whether and to what extent the prohibitions of § 5, or their application in this case, are consistent with the provisions of the National Labor Relations Act. Both the parties and the Government, which has appeared as *amicus curiae,* have advanced contentions on this issue independent of those put forward upon the question of constitutionality. Since a majority of the Court do not agree that § 5 or its present application conflicts with the National Labor Relations Act, our decision rests exclusively upon the grounds we have stated for finding that the statute as applied contravenes the Constitution.

---

nection with the felony inquiry or showing of bona fide affiliation will satisfy the Secretary is not made clear on the record. And, according to the Texas court's decision, "all who come within the provisions of the Act *upon their good-faith compliance* therewith" are entitled to receive the card. (Emphasis added.) Compliance under the decision, it would seem, requires the Secretary to determine the good faith of the application, and thus the sufficiency of the authority to act for the union represented. Whether, in some instances at least, these determinations would go beyond "merely ministerial" action and require the exercise of discretion, or the time required to comply, by completing the routine, would so add to the burden that these things might amount to undue previous restraint or censorship, where mere registration or previous identification might not do so, need not be determined.

From the time the Act became effective in August, 1943, until the the date of trial, September 25, 1943, 223 labor organizers' cards were issued. During that period 40 or 50 applications for cards were returned to the applicants for failure to fill in the information requested or to sign the application or to attach credentials. Of those all but 15 or 20 have been resubmitted and cards were granted. No application has been "positively denied" since the Act became effective.

The restraint is not small when it is considered what was restrained. The right is a national right, federally guaranteed. There is some modicum of freedom of thought, speech and assembly which all citizens of the Republic may exercise throughout its length and breadth, which no State, nor all together, nor the Nation itself, can prohibit, restrain or impede. If the restraint were smaller than it is, it is from petty tyrannies that large ones take root and grow. This fact can be no more plain than when they are imposed on the most basic rights of all. Seedlings planted in that soil grow great and, growing, break down the foundations of liberty.

In view of the disposition we make of the cause, it is unnecessary to rule upon the motion appellee has filed to require appellant to furnish security for his appearance to serve the sentence.

The judgment is

*Reversed.*

MR. JUSTICE DOUGLAS, concurring.

The intimation that the principle announced in this case serves labor alone and not an employer has been adequately answered in the opinion of the Court in which I join. But the emphasis on such cases as *Labor Board* v. *Virginia Electric & Power Co.*, 314 U. S. 469, and *Virginia Electric & Power Co.* v. *Labor Board,* 319 U. S. 533, to prove that discrimination exists moves me to add these words. Those cases would be relevant here if we were dealing with legislation which regulated the relations between unions and their members. Cf. *Steele* v. *Louisville & Nashville R. Co., ante,* p. 192. No one may be required to obtain a license in order to speak. But once he uses the economic power which he has over other men and their jobs to influence their action, he is doing more than exercising the freedom of speech protected by the First Amend-

ment. That is true whether he be an employer or an employee. But as long as he does no more than speak he has the same unfettered right, no matter what side of an issue he espouses.

MR. JUSTICE BLACK and MR. JUSTICE MURPHY join in this opinion.

MR. JUSTICE JACKSON, concurring.

As frequently is the case, this controversy is determined as soon as it is decided which of two well-established, but at times overlapping, constitutional principles will be applied to it. The State of Texas stands on its well-settled right reasonably to regulate the pursuit of a vocation, including—we may assume—the occupation of labor organizer. Thomas, on the other hand, stands on the equally clear proposition that Texas may not interfere with the right of any person peaceably and freely to address a lawful assemblage of workmen intent on considering labor grievances.

Though the one may shade into the other, a rough distinction always exists, I think, which is more shortly illustrated than explained. A state may forbid one without its license to practice law as a vocation, but I think it could not stop an unlicensed person from making a speech about the rights of man or the rights of labor, or any other kind of right, including recommending that his hearers organize to support his views. Likewise, the state may prohibit the pursuit of medicine as an occupation without its license, but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought. So the state to an extent not necessary now to determine may regulate one who makes a business or a livelihood of soliciting funds or memberships for unions. But I do not think it can prohibit one,

even if he is a salaried labor leader, from making an address to a public meeting of workmen, telling them their rights as he sees them and urging them to unite in general or to join a specific union.

This wider range of power over pursuit of a calling than over speech-making is due to the different effects which the two have on interests which the state is empowered to protect. The modern state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money. When one does so through the practice of a calling, the state may have an interest in shielding the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency. A usual method of performing this function is through a licensing system.

But it cannot be the duty, because it is not the right, of the state to protect the public against false doctrine. The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion. In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us. *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624. Nor would I. Very many are the interests which the state may protect against the practice of an occupation, very few are those it may assume to protect against the practice of propagandizing by speech or press. These are thereby left great range of freedom.

This liberty was not protected because the forefathers expected its use would always be agreeable to those in authority or that its exercise always would be wise, temperate, or useful to society. As I read their intentions, this liberty was protected because they knew of no other

way by which free men could conduct representative democracy.[1]

The necessity for choosing collective bargaining representatives brings the same nature of problem to groups of organizing workmen that our representative democratic processes bring to the nation. Their smaller society, too, must choose between rival leaders and competing policies. This should not be an underground process. The union of which Thomas is the head was one of the choices offered to these workers, and to me it was in the best American tradition that they hired a hall and advertised a meeting, and that Thomas went there and publicly faced his labor constituents. How better could these men learn what they might be getting into? By his public appearance and speech he would disclose himself as a temperate man or a violent one, a reasonable leader that well-disposed workmen could follow or an irresponsible one from whom they might expect disappointment, an earnest and understanding leader or a self-seeker. If free speech anywhere serves a useful social purpose, to be jealously guarded, I should think it would be in such a relationship.

But it is said that Thomas urged and invited one and all to join his union, and so he did. This, it is said, makes the speech something else than a speech; it has been found

---

[1] Woodrow Wilson put the case for free speech in this connection aptly: "I have always been among those who believed that the greatest freedom of speech was the greatest safety, because if a man is a fool, the best thing to do is to encourage him to advertise the fact by speaking. It cannot be so easily discovered if you allow him to remain silent and look wise, but if you let him speak, the secret is out and the world knows that he is a fool. So it is by the exposure of folly that it is defeated; not by the seclusion of folly, and in this free air of free speech men get into that sort of communication with one another which constitutes the basis of all common achievement." Address at the Institute of France, Paris, May 10, 1919. 2 Selected Literary and Political Papers and Addresses of Woodrow Wilson (1926) 333.

by the Texas courts to be a "solicitation" and therefore its immunity from state regulation is held to be lost. It is not often in this country that we now meet with direct and candid efforts to stop speaking or publication as such. Modern inroads on these rights come from associating the speaking with some other factor which the state may regulate so as to bring the whole within official control. Here, speech admittedly otherwise beyond the reach of the states is attempted to be brought within its licensing system by associating it with "solicitation." Speech of employers otherwise beyond reach of the Federal Government is brought within the Labor Board's power to suppress by associating it with "coercion" or "domination." Speech of political malcontents is sought to be reached by associating it with some variety of "sedition." Whether in a particular case the association or characterization is a proven and valid one often is difficult to resolve. If this Court may not or does not in proper cases inquire whether speech or publication is properly condemned by association, its claim to guardianship of free speech and press is but a hollow one.

Free speech on both sides and for every faction on any side of the labor relation is to me a constitutional and useful right. Labor is free to turn its publicity on any labor oppression, substandard wages, employer unfairness, or objectionable working conditions. The employer, too, should be free to answer, and to turn publicity on the records of the leaders or the unions which seek the confidence of his men. And if the employees or organizers associate violence or other offense against the laws with labor's free speech, or if the employer's speech is associated with discriminatory discharges or intimidation, the constitutional remedy would be to stop the evil, but permit the speech, if the two are separable; and only rarely and when they are inseparable to stop or punish speech or publication.

But I must admit that in overriding the findings of the Texas court we are applying to Thomas a rule the benefit of which in all its breadth and vigor this Court denies to employers in National Labor Relations Board cases. Cf. *Labor Board* v. *Virginia Electric & Power Co.,* 314 U. S. 469, 479; *Virginia Electric & Power Co.* v. *Labor Board,* 319 U. S. 533; *Trojan Powder Co.* v. *Labor Board,* 135 F. 2d 337, cert. denied, 320 U. S. 768; *Labor Board* v. *American Tube Bending Co.,* 134 F. 2d 993, cert. denied, 320 U. S. 768; *Elastic Stop Nut Corp.* v. *Labor Board,* 142 F. 2d 371, cert. denied, *post,* p. 722. However, the remedy is not to allow Texas improperly to deny the right of free speech but to apply the same rule and spirit to free speech cases whoever the speaker.

I concur in the opinion of MR. JUSTICE RUTLEDGE that this case falls in the category of a public speech, rather than that of practicing a vocation as solicitor. Texas did not wait to see what Thomas would say or do. I cannot escape the impression that the injunction sought before he had reached the state was an effort to forestall him from speaking at all and that the contempt is based in part at least on the fact that he did make a public labor speech.

I concur in reversing the judgment.

MR. JUSTICE ROBERTS.

The right to express thoughts freely and to disseminate ideas fully is secured by the Constitution as basic to the conception of our government. A long series of cases has applied these fundamental rights in a great variety of circumstances.[1] Not until today, however, has it been ques-

---

[1] *Stromberg* v. *California,* 283 U. S. 359; *Near* v. *Minnesota,* 283 U. S. 697; *Grosjean* v. *American Press Co.,* 297 U. S. 233; *De Jonge* v. *Oregon,* 299 U. S. 353; *Herndon* v. *Lowry,* 301 U. S. 242; *Lovell* v. *Griffin,* 303 U. S. 444; *Hague* v. *C. I. O.,* 307 U. S. 496; *Schneider* v. *Irvington,* 308 U. S. 147; *Thornhill* v. *Alabama,* 310 U. S. 88; *Carl-*

tioned that there was any clash between this right to think one's thoughts and to express them and the right of people to be protected in their dealings with those who hold themselves out in some professional capacity by requiring registration of those who profess to pursue such callings.   Doctors and nurses, lawyers and notaries, bankers and accountants, insurance agents and solicitors of every kind in every State of this Union have traditionally been under duty to make some identification of themselves as practitioners of their calling.   The question before us is as to the power of Texas to call for such registration within limits precisely defined by the Supreme Court of that State in sustaining the statute now challenged.   The most accurate way to state the issue is to quote the construction which that Court placed upon the Texas statute and the exact limits of its requirement:

"A careful reading of the section of the law here under consideration will disclose that it does not interfere with the right of the individual lay members of unions to solicit others to join their organization.   It does not affect them at all.   It applies only to those organizers who for a pecuniary or financial consideration solicit such membership.   It affects only the right of one to engage in the business as a paid organizer, and not the mere right of an individual to express his views on the merits of the union.   Furthermore, it will be noted that the Act does not require a paid organizer to secure a license, but merely requires him to register and identify himself and the union for which he proposes to operate before being permitted

son v. *California,* 310 U. S. 106; *Cantwell* v. *Connecticut,* 310 U. S. 296; *American Federation of Labor* v. *Swing,* 312 U. S. 321; *Bridges* v. *California,* 314 U. S. 252; *Bakery Drivers Local* v. *Wohl,* 315 U. S. 769; *Martin* v. *Struthers,* 319 U. S. 141; *Taylor* v. *Mississippi,* 319 U. S. 583; *Cafeteria Employees Union* v. *Angelos,* 320 U. S. 293. Compare *Murdock* v. *Pennsylvania,* 319 U. S. 105; *Douglas* v. *Jeannette,* 319 U. S. 157; *Board of Education* v. *Barnette,* 319 U. S. 624; *Follett* v. *McCormick,* 321 U. S. 573.

to solicit members for such union. The Act confers no unbridled discretion on the Secretary of State to grant or withhold a registration card at his will, but makes it his mandatory duty to accept the registration and issue the card to all who come within the provisions of the Act upon their good-faith compliance therewith."

The record discloses that Texas, in the exercise of her police power, has adopted a statute regulating labor unions. With many of its provisions we are not presently concerned. The constitutional validity of but a single section is drawn in question. That section requires every "labor union organizer" (defined by the Act as a person "who for a pecuniary or financial consideration solicits memberships in a labor union or members for a labor union") to request, in writing, of the Secretary of State, or personally to apply to the Secretary for an "organizer's card," before soliciting members for his organization, and to give his name, his union affiliation, and his union credentials.[2] The Secretary is then to issue to him a card showing his name and affiliation, which is to be signed by him and also signed and sealed by the Secretary of State, and is to bear the designation "labor organizer." It is made the duty of the organizer to carry the card and, on request, to exhibit it to any person he solicits.

The Act makes violation the basis of criminal prosecution and authorizes injunctions to prevent threatened disregard of its provisions. In this instance both procedures were followed, but there is before us only the validity of an injunction and the sanction imposed for refusal to obey it.

---

[2] A section of the Act forbids an alien or a convicted felon whose civil rights have not been restored to act as a labor organizer, but these provisions were not here invoked or applied and nothing in this case turns on them. There is no occasion to discuss them until they are drawn in question. And in addition, § 15 of the Act contains a sweeping severability clause.

As always, it is important to reach the precise question presented. One path to this end is to note what is not involved.

First, no point is made of the circumstance that the appellant's proposed activity was enjoined in advance. Counsel at our bar asserted the constitutional vice lay in the prohibition of the statute and that vice would preclude arrest and conviction for violation, no less than injunction against the denounced activity.

Secondly, the appellant does not contend that he was other than a "labor organizer" within the meaning of the Act. In fact he is an officer of a union and not employed specifically as an organizer or solicitor of memberships. He might well have questioned the application of the law to him, or to a public address made by him in his official capacity, but he refrained, obviously because he wished to test the Act's validity and so, in effect, stipulated that its sweep included him, and his conduct on the occasion in question.

Thirdly, the appellant does not contend that, in attempting to identify solicitors and preclude solicitation without identification, the statute either in terms, or as construed and applied, reaches over into the realm of public assembly, of public speaking, of argument or persuasion. Aware that the State proposed to invoke the statute against him, he made sure that the bare right he asserted to solicit without compliance with its requirement should not be clouded by confusion of that right with the others mentioned. In his address, therefore, he was at pains to state that he then and there solicited members of the audience to join a named union; and to make assurance of violation doubly sure, he solicited a man by name and offered him a membership application, which the man then and there signed.

Fourthly, the Act and the injunction which he disobeyed say nothing of speech; they are aimed at a trans-

action,—that of solicitation of members for a union. This, and this only, is the statutory object which is said to render it unconstitutional.

We are now in a position accurately to state the appellant's contention. He asserts that, under the Constitutional guarantees, there is a sharp distinction between business rights and civil rights; that in *discussion* of labor problems, and equally in *solicitation* of union membership, civil rights are exercised; that labor organizations are the only effective means whereby employes may exercise the guaranteed civil rights, and that, consequently, *any* interference with the right to solicit membership in such organizations is a prohibited abridgment of these rights, even though the Act applies only to paid organizers.

The argument then seeks to draw a distinction between this case and those in which we have sustained registration of persons who desire to use the streets or to solicit funds; urges that the burden the Act lays on labor organizations is substantial and seriously hampering and is not intended to prevent any "clear and present danger" to the State.

Stripped to its bare bones, this argument is that labor organizations are beneficial and lawful; that solicitation of members by and for them is a necessary incident of their progress; that freedom to solicit for them is a liberty of speech protected against state action by the Fourteenth Amendment and the National Labor Relations Act, and hence Texas cannot require a paid solicitor to identify himself. I think this is the issue and the only issue presented to the courts below and decided by them, and the only one raised here. The opinion of the court imports into the case elements on which counsel for appellant did not rely; elements which in fact counsel strove to eliminate in order to come at the fundamental challenge to any requirement of identification of a labor organizer.

The position taken in the court's opinion that in some way the statute interferes with the right to address a meeting, to speak in favor of a labor union, to persuade one's fellows to join a union, or that at least its application in this case does, or may, accomplish that end is, in my judgment, without support in the record.

We must bear in mind that the appellant himself was persuaded that merely to make the speech he had come to Texas to deliver would not violate the Act, and that he, therefore, determined, in order to preclude all doubt as to violation, to solicit those present to join the union. And, for the same purpose, he further specifically solicited an individual.

He had not been enjoined from making a speech, nor from advocating union affiliation. The injunction, in terms, forbade "soliciting membership in Local Union No. 1002 . . ." or "memberships in any other labor union" without first obtaining a card. The information on which the citation for contempt was based charged (1) that he solicited Pat O'Sullivan to join a local union on September 23; (2) that on the same day he openly and publicly solicited an audience of some three hundred persons to join the Oil Workers International Union. The uncontradicted evidence is that, with application blanks in his hand, he said: "I earnestly urge and solicit all of you that are not members of your local union to join your local unions. I do that in the capacity of Vice-President of C. I. O."

The text of the speech put in evidence by the appellant does not differ materially. It runs: "as Vice-President of the C. I. O. and as a union man, I earnestly ask those of you who are not now members of the Oil Workers International Union to join now. I solicit you to become a member of the union of your fellow workers . . ."

The judgment in the contempt proceeding states only that the court "finds that the defendant . . . did . . .

violate this court's temporary restraining order heretofore issued injoining and restraining him, the said R. J. Thomas, from soliciting members to join the Oil Workers International Union . . ."

In his petition to the State Supreme Court for *habeas corpus,* the appellant did not suggest that, under the guise of preventing him from soliciting, he was held in contempt for making an address. The opinion of that court states that the complaint charged appellant with engaging "in soliciting members for a certain labor union"; with violating the injunction issued "by soliciting members for said union"; and adds: *"Relator's counsel in his argument before this Court conceded the existence of necessary factual basis for the judgment in the contempt proceedings."* (Italics supplied.) Thus it appears that below, as here, the challenge was not against the form or content of the pleadings or the order; not that Texas was trying to enjoin appellant from making a speech, but that it could not regulate solicitation.

In construing the statute, the court below said: "It applies only to those organizers who for a pecuniary or financial consideration solicit such membership." Thus it excluded all questions as to the right of speech and assembly as such.

In his motion for a rehearing below, the appellant advanced no contention that the judgment was directed at his speech as such.

In his statement as to jurisdiction filed in this court he said: "Appellant delivered his speech to the meeting attended largely by workers of the Humble Oil Company *and* solicited the audience in general and one Pat O'Sullivan in particular to join the Oil Workers International Union." (Italics supplied.)

In his statement of points to be relied on in this court, he stated he would urge that the Act is unconstitutional because it "imposes a previous general restraint upon the

exercise of appellant's right of free speech by prohibiting appellant from *soliciting workers to join a union,"* without obtaining an organizer's card. And again that it violated other Constitutional provisions "in requiring appellant to obtain a license (organizer's card) before *soliciting workers to join a union."* (Italics supplied.)

Nowhere in the document is there any suggestion that the statute is intended, or has been applied, to restrain or restrict the freedom to speak, save only as speech is an integral part of the transaction of paid solicitation of men to join a union.

Since its requirements are not obviously burdensome, we cannot void the statute as an unnecessary or excessive exercise of the State's police power on any *a priori* reasoning. The State Supreme Court has found that conditions exist in Texas which justify and require such identification of paid organizers as the law prescribes. There is not a word of evidence in the record to contradict these conclusions. In the absence of a showing against the need for the statute this court ought not incontinently to reject the State's considered views of policy.

The judgment of the court below that the power exists reasonably to regulate solicitation, and that the exercise of the power by the Act in question is not unnecessarily burdensome, is not to be rejected on abstract grounds. No fee is charged. The card may be obtained by mail. To comply with the law the appellant need only have furnished his name and affiliation, and his credentials. The statute nowise regulates, curtails, or bans his activities.

We are asked then, on this record, to hold, without evidence to support such a conclusion, and as a matter of judicial notice, that Texas has no *bona fide* interest to warrant her law makers in requiring that one who engages, for pay, in the business of soliciting persons to join unions shall identify himself as such. That is all the law requires.

We should face a very different question if the statute attempted to define the necessary qualifications of an organizer; purported to regulate what organizers might say; limited their movements or activities; essayed to regulate time, place or purpose of meetings; or restricted speakers in the expression of views. But it does none of these things.

It is suggested that the Act is to be distinguished from legislation regulating the use of the streets or the solicitation of money. As respects the former, I think our decision in *Cox* v. *New Hampshire,* 312 U. S. 569, and that of the Circuit Court of Appeals in *City of Manchester* v. *Leiby,* 117 F. 2d 661, are indistinguishable in principle, and the court below properly so held. If one disseminating news for his own profit may rightfully be required to identify himself, so may one who, for profit, solicits persons to join an organization.

As respects the second, I see no reason to limit what was said in *Cantwell* v. *Connecticut,* 310 U. S. 296, 305, to solicitation of money. The solicitation at which the Texas Act is aimed may or may not involve the payment of initiation fees or dues to the solicitor. But, in any case, it involves the assumption of business and financial liability by him who is persuaded to join a union. The transaction is in essence a business one. Labor unions are business associations; their object is generally business dealings and relationships as is manifest from the financial statements of some of the national unions. Men are persuaded to join them for business reasons, as employers are persuaded to join trade associations for like reasons. Other paid organizers, whether for business or for charity, could be required to identify themselves. There is no reason why labor organizers should not do likewise. I think that if anyone pursues solicitation as a business for profit, of members for any organization, religious, secular or business, his calling does not bar the State from

requiring him to identify himself as what he is,—a paid solicitor.

We may deem the statutory provision under review unnecessary or unwise, but it is not our function as judges to read our views of policy into a Constitutional guarantee, in order to overthrow a state policy we do not personally approve, by denominating that policy a violation of the liberty of speech. The judgment should be affirmed.

The CHIEF JUSTICE, MR. JUSTICE REED and MR. JUSTICE FRANKFURTER join in this opinion.