Franz GLEN, Petitioner,

v.

Richard HONGISTO, Sheriff of San Francisco County, and Clayton Horn, Judge, Superior Court, San Francisco, Ca., Respondents.

George EVANKOVICH, Petitioner,

v.

Richard HONGISTO, Sheriff of San Francisco County, and Clayton Horn, Judge, Superior Court, City and County of San Francisco, Respondents.

Joseph P. MAZZOLA, Petitioner,

v.

Richard HONGISTO, Sheriff of San Francisco County, and Clayton Horn, Judge, Superior Court, City and County of San Francisco, Respondents.

Nos. C–76–1857 WHO, C–76–1860 WHO and C–76–1861 WHO.

United States District Court,
N. D. California.

Jan. 20, 1977.

Jerome Garchik, Neyhart & Anderson, San Francisco, Cal., for Franz Glen.

Victor Van Bourg, Van Bourg, Allen, Weinberg & Rogers, San Francisco, Cal., Brundage, Beeson & Pappy, Los Angeles, Cal., for George Evankovich.

Brundage, Beeson & Pappy, Los Angeles, Cal., Marvin E. Lewis, Lewis, Rouda & Lewis, San Francisco, Cal., for Joseph P. Mazzola.

Thomas M. O'Connor, City Atty., George Baglin, Deputy City Atty., San Francisco, Cal., for respondent Richard Hongisto.

ORRICK, District Judge.

## OPINION AND ORDER

Petitioners, Franz Glen, George Evankovich, and Joseph P. Mazzola, were held in contempt of court on June 21, 1976, for violating a preliminary injunction issued by the Superior Court of the City and County of San Francisco on April 12, 1976; each was sentenced to serve five days in the county jail and to pay a fine of $500. Each petitions this Court to issue writs of *habeas corpus* under 28 U.S.C. § 2241, alleging that the sentences were imposed in violation of their constitutional rights. The judgments

and orders of contempt have been stayed[1] pending this Court's determination of the petitions. For the reasons hereinafter stated, this Court finds that a writ of *habeas corpus* should issue as to each individual.

### I.

The petitioners are local union officers. Evankovich is business manager of Local 261 of the Laborers International Union of North America; Glen is business manager-financial secretary of the International Brotherhood of Electrical Workers, Local 6; and Mazzola is business manager-financial secretary-treasurer of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, Local 38. On March 31, 1976, the Superior Court issued a temporary restraining order prohibiting certain concerted action by the petitioners and others. On April 12, 1976, the court, after hearing the evidence and arguments of counsel, issued a preliminary injunction as follows:

"IT IS ORDERED that, during the pendency of this action, said defendants are enjoined and prohibited from

'1. Striking, or calling or inducing or giving notice of a strike, against the plaintiff, City and County of San Francisco;

'2. Picketing said plaintiff's facilities, buildings, and properties in support, promotion or advocacy of a strike against said plaintiff;

'3. Hindering, delaying or interfering with work at the facilities, buildings and properties of said plaintiff, in support, promotion, or advocacy of a strike against said plaintiff.' "

A few days later (on April 15 and 19), the court issued orders to show cause in re contempt for violation of the injunction. After six days of hearings, petitioners were adjudged in contempt of the Superior Court. The court found that a strike had been called by the petitioners and others against the City and County of San Francisco on March 31, 1976, and that it had continued through April, 1976. (Memorandum Opinion at 3.) In connection with this finding, the court determined that certain labor organizations had willfully and knowingly violated the injunction by engaging in a series of acts constituting illegal concerted activity against the City. (Memorandum Opinion at 4.) As to the petitioners, the court found that each had violated the injunction by authorizing the publication of a newspaper advertisement which stated that the strike could be settled only through negotiations.[2] (Memorandum Opinion at 10–11.) Terming the advertisement a "hor-

---

1. Among the original petitioners were certain labor organizations. The stay ordered on September 1, 1976, included these groups. On September 8, however, this Court denied the petitions and dissolved the stay as to the organizations, noting that since the Great Writ may be invoked only to challenge the custody of "persons", it will not lie to review an order of contempt against such legal entities. *See In re Coleman*, 12 Cal.3d 568, 572 n.2, 116 Cal.Rptr. 381, 384 n.2, 526 P.2d 533, 536 n.2 (1974). Thereafter, the San Francisco Building and Construction Trades Council, the Laborers International Union, Local 261, and the San Francisco Labor Council filed civil rights actions under 42 U.S.C. § 1983. These suits are not under consideration here.

It should further be noted that at a hearing before this Court, the parties stipulated that they were willing to forego the issuance of an order to show cause. Respondents agreed to waive any argument that the Court's failure to issue an order to show cause precluded it from making any factual or legal contentions. The necessity for further evidentiary hearings is

thus obviated. Petitioners have exhausted available state procedures for challenging the judgments of contempt.

2. The full text of the advertisement read as follows:

"NEGOTIATE—NOW!
State law declares it.
City ordinance requires it.
Good sense demands it.

The only way to end this impasse is through hard, determined, around-the-clock, good-faith negotiations.

The Board of Supervisors is charged under state law and city ordinance to set city pay by collective bargaining.

For weeks now, it has ducked that responsibility. It reneged on an understanding reached with its negotiator. It refused to discuss economic issues of any kind. Now it is trying to impose its own solution on us by another kind of political club—ballot propositions.

None of these devices has anything to do with the issues. None of them can settle the strike.

tatory declamation", the court found that its authorization and publication had "abett[ed] and advis[ed] the striking unions and others to ignore the court orders and escalate their efforts".[3]

## II.

The petitioners attack the validity of their contempt adjudications on several grounds. First, they claim that the injunction was issued without an adequate factual basis and was unconstitutionally vague and overbroad. Second, petitioners contend that the evidence adduced at the contempt hearings was insufficient to support a finding that they violated the order. Finally, they assert that they cannot be held in contempt for the mere publication of a newspaper advertisement discussing political and economic issues in a public employee labor dispute because the dissemination of such information is protected by the First Amendment.

## A.

While the Memorandum Opinion accompanying the contempt order appears to have based the finding of contempt by the petitioners solely on the publication of the advertisement,[4] the court did mention that it had "not set forth in detail *all* of the elements relied upon in its decision". (Memorandum Opinion at 8, *emphasis added*.) Thus, it would be possible to argue that there may have been other bases for the contempt finding. This argument, however, is both inappropriate and irrelevant. The Supreme Court in *Thomas v. Collins*, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945), indicated that a contempt judgment based partly on protected activity cannot stand. In *Thomas*, a labor organizer was

---

Only negotiations. Intensive, good-faith, around-the-clock negotiations.

Federal mediation can get talks started and help keep them going. We're willing—but not under terms that demand our 'unconditional surrender.'

No strings. Just plain collective bargaining. We're ready—on an hour's notice.

*Striking City Employees*

Strike headquarters 1623½ Market Street, San Francisco

*Pay cuts*

That's what this strike's all about

The Supervisors demand that we take pay cuts ranging from $2,700 to $5,000 a year and more.

Mayor Moscone gets a raise of $3,030 a year. Other top city brass get raises of $3,000 to $5,000 a year. *Living costs continue to rise.* Other workers' living standards go up. But we're told—not asked—to take a cut in pay.

To enforce its demand, the Board has totally denied us the good-faith collective bargaining promised us in state law and city ordinance.

Instead, it enacted its unilateral proposal into law—without negotiations. It refused to discuss any economic issues. It has hidden behind its own ordinance cutting off itself—and the mayor—*from face-to-face talks.*

Now it proposes to put the 'issues' on the ballot. It does not make sense. How can you set pay scales for 303 job classifications by popular vote? How can you meet the city charter's requirement of 'comparable pay for comparable work?' How do you fulfil the legal responsibility for collective bargaining by putting it on the ballot?

Intensive, around-the-clock negotiations are the only answer—the only way out.

Why must we wait any longer?

published by the

JOINT NEGOTIATING COMMITTEE

Joseph O'Sullivan

Carpenters, Local 22

George Evankovich

Laborers, Local 261

Franz E. Glen

Electricians, Local 6

Joseph P. Mazzola

Plumbers & Pipefitters, Local 38

Stanley Jensen

Machinists, District Lodge 115

Stanley M. Smith

San Francisco Building &

Construction Trades Council.

Our strike is endorsed by the San Francisco Labor Council; AFL–CIO, SF Building & Construction Trades Council; Bay Cities Metal Trades Council; Joint Council of Teamsters, ILWU . . ."

**3.** Petitioner Glen, the court found, had furnished further evidence of contempt in certain declarations which he had filed with the court, from which were drawn the inference that Glen "advised his union members to flaunt the prohibitory injunction" at a time when he knew *such judicial restraints were in effect.* At this point, the court found that Glen was therefore guilty of two acts of contempt (Memorandum Opinion at 9–10). In the judgment, however, the court found each petitioner guilty of one act of contempt and sentenced and fined each identically.

**4.** As to petitioner Glen, see note 3, *supra*.

**14**

held in contempt (fined and sentenced to three days in jail) for ignoring an *ex parte* restraining order prohibiting him from violating a Texas registration statute and soliciting labor union memberships in violation thereof. In reversing the judgment of contempt, the Court found it irrelevant that *one* of the acts for which Thomas was held in contempt might validly have been punished. Because the judgment was phrased in general terms and imposed a single penalty for the violations, and because Thomas was, therefore, punished at least in part for protected activity, the Court held that the statute was applied unconstitutionally and that the judgment must fail. *Thomas v. Collins, supra,* 323 U.S. at 529, 65 S.Ct. 315.[5]

The Superior Court in the present case stated that the judgment was based on publication of the advertisement. Thus, according to the reasoning in *Thomas,* the judgment must be reversed, regardless of other possible bases for a contempt finding, unless it was constitutionally permissible to punish the publication as a violation of the injunction.

In addition, the respondents (the City) have themselves narrowed the issues here. The City did originally raise the argument that petitioners were punished for conduct in addition to publication of the advertisement. Nevertheless, counsel for the City stated at the hearing before this Court on October 5, 1976, after a discussion of *Thomas,* that he was "willing" to "defend just on the advertisement".

### B.

Accordingly, the only issue here is whether the Superior Court could, consistent with

the First Amendment, find petitioners in violation of the injunction and thereby hold them in contempt of court for publication of the newspaper advertisement.

This issue, in turn, raises two distinct First Amendment questions. The first is whether the injunction was constitutionally defective on its face owing to impermissibly vague and overbroad language. The second is whether the injunction could be constitutionally applied to the publication. It is the second question which is central to the disposition of this case.

■ Had the injunction by its terms prohibited the publication, there would have been no question that the publication of the advertisement evidenced disregard of the order. In such a case, the determination of the petition for *habeas corpus* would depend on whether the injunction was unconstitutional on its face and, if so, whether petitioners could choose to ignore it. The rule in California, articulated in *In re Berry,* 68 Cal.2d 137, 65 Cal.Rptr. 273, 436 P.2d 273 (1968), is that a person affected by an injunction may challenge its validity by either of two methods. First, he may comply with the order while seeking further judicial relief. Second, he may disobey the order and raise his claims as a defense in a contempt proceeding. If he selects the latter alternative, he may be punished only if the validity of the order is upheld. *See In re Berry, supra,* 68 Cal.2d at 149, 65 Cal.Rptr. at 281, 436 P.2d at 281.[6]

In contrast, federal courts, at least in some circumstances, have applied a rule

---

**5.** Since the organizer in *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945), openly disregarded the order, it might be argued that contempt would have been justified as punishment for lack of respect for the judicial process, regardless of the constitutionality of the order. Thus, it could be contended that the decision in *Thomas* that an injunction covering protected activity must fail is inconsistent with the rule commonly followed by the federal courts that one may not test the constitutionality of an injunction by disregarding it. *See* discussion *infra.* As explained *infra,* however, this rule cannot rationally be applied when the question is not whether the injunction is un-

constitutional on its face, but rather whether its application to the conduct in question is permissible. Similarly, the holding in *Thomas* should remain viable when the question is one of application.

**6.** The California rule stems from a number of state court decisions holding that "the violation of an order in excess of the jurisdiction of the issuing court cannot produce a valid judgment of contempt". *In re Berry,* 68 Cal.2d 137, 147, 65 Cal.Rptr. 273, 280, 436 P.2d 273, 280 (1968). "Jurisdiction" refers to power conferred by constitutional, statutory, or decisional law. *Id.*

(hereinafter referred to as "the federal rule") that:

" * * * an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings * * * without regard even for the constitutionality of the Act under which the order is issued." *United States v. United Mine Workers,* 330 U.S. 258, 293, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947).

*See Howat v. Kansas,* 258 U.S. 181, 189–190, 42 S.Ct. 277, 66 L.Ed. 550 (1922); *Walker v. City of Birmingham,* 388 U.S. 307, 314, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967); *cf. Maness v. Meyers,* 419 U.S. 449, 458–459, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975); *but cf. United States v. Ryan,* 402 U.S. 530, 532 n.4, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971). If this federal rule applied, in the hypothetical situation described above the constitutionality of enjoining the advertisement would be largely irrelevant. If petitioners were shown to have disregarded the order, the finding of contempt would be proper, unless the order were found to be "transparently invalid or had only a frivolous pretense to validity" (*Walker v. City of Birmingham, supra,* 388 U.S. at 315, 87 S.Ct. at 1829; *see In re Berry, supra,* 68 Cal.2d at 150, 65 Cal.Rptr. at 282, 436 P.2d at 282 [7] or unless, perhaps, another narrow exception were recognized.[8]

In the present case, however, the injunction did *not* on its face prohibit the publication in question; *nor* did it clearly cover the activity. Therefore, this Court cannot determine that in publishing the advertisement, petitioners were disregarding the injunction in order to test its validity. The crucial question in a case such as the present one is *not* whether petitioners were free to disregard the injunction, but rather whether *application* of the injunction to the publication was permissible.

The California Supreme Court in *Berry* appears to have recognized this distinction when it spoke of "the California rule that an order *void upon its face* cannot support a contempt judgment". *In re Berry, supra,* 68 Cal.2d at 150, 65 Cal.Rptr. at 282, 436 P.2d at 282 (emphasis added). The suggestion is thus that the California rule-federal rule difference, to whatever extent it exists, concerns facial invalidity only.

Similarly, the principal decisions relied on as establishing a "federal rule" all concerned orders which clearly covered the activities in question. *See, e. g., United States v. United Mine Workers, supra,* 330 U.S. at 266–267, 67 S.Ct. 677; *Howat v. Kansas, supra; Walker v. City of Birmingham,* 388 U.S. at 317, 87 S.Ct. 1824. Indeed, in *Walker,* the Court noted that four of the eight petitioners had held a press conference at which they had distributed state-

---

**7.** In *In re Berry,* Justice Sullivan equated transparent invalidity with facial invalidity, observing that:

"* * * it is notable that the majority in *Walker* indicated that the [state rule in that case like the federal rule] might be constitutionally impermissible in a case wherein the order or ordinance involved was unconstitutional on its face, or was 'transparently invalid or had only a frivolous pretense to validity.' Thus it appears that the *Walker* decision is consistent with the California rule that an order void upon its face cannot support a contempt judgment." *In re Berry,* 68 Cal.2d 137, 150, 65 Cal.Rptr. 273, 282, 436 P.2d 273, 282 (1968).

This attempt at harmonizing the two rules appears unsuccessful. The *Berry* rule allows a person affected by an injunction to challenge it by disobedience regardless of the closeness of the constitutional question. The fact that an injunction is void "on its face" does not mean that it is transparently frivolous, but rather that its unconstitutionality appears in its very terms, not in its application. While in situations involving transparent invalidity both the *Berry* rule and the federal rule would allow disobedience with impunity, only the *Berry* rule would permit disregard of an injunction void on its face, but not frivolous. This conclusion is strengthened by the fact that the Court in *Walker v. Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), was unmoved by albeit "substantial" claims of overbreadth and vagueness—presumably arguments concerning facial but *not* transparent defects—determining that petitioners there were not free to bypass judicial review by disobeying the injunction. *Walker v. Birmingham, supra,* 388 U.S. at 319–320, 87 S.Ct. 1824.

**8.** *See* note 11, *infra.*

ments declaring their intention to disobey the injunction. Likewise, one of the petitioners had stated at a meeting, " 'Injunction or no injunction we are going to march tomorrow' ". *Walker v. City of Birmingham, supra,* 388 U.S. at 310, 87 S.Ct. at 1826.

Moreover, the distinction drawn here is consistent with the rationale underlying the federal rule that the contempt judgment is intended to punish disrespect of or opposition to the judicial process. *See Walker v. City of Birmingham, supra,* 388 U.S. at 320–321, 87 S.Ct. 1824. Dobbs, *Contempt of Court: A Survey,* Cornell L.Rev. 183 (1971).[9] When, as here, the activity punished is not proscribed in terms, and when, as here, a substantial question exists as to the applicability of the injunction to the

conduct involved, it would be unjust to base a contempt judgment on supposed disregard of the injunction.

In short, the federal rule cited above cannot justify a finding of contempt here since the pivotal question is one of the constitutionality of the injunction as applied rather than its facial validity.[10] Accordingly, this Court finds that a determination of the scope of the federal rule is unnecessary to disposition of the present case for the plain reason that even if petitioners were *not* free to disregard the injunction, their activity does not clearly evidence disregard.[11] Therefore, the Court declines to decide whether petitioners could have ignored the injunction with impunity if it were subsequently found impermissibly vague or overbroad.[12]

---

**9.** Professor Dobbs points out that even occasional decisions to allow disregard of injunctions are motivated by respect for the process:

" * * * [I]n some cases, not at all well-defined, courts have refused to permit contempt convictions for the violation of improper court orders, presumably in the belief that enforcement of an unlawful order is itself more unlawful than its violation and more apt to lessen respect for the process." Dobbs, *Contempt of Court: A Survey,* 56 Cornell L.Rev. 183, 216 (1971) (citation omitted).

**10.** Of course, the question of facial invalidity is not foreclosed in the present situation. Petitioners refer, however, to facial vagueness and overbreadth, not to any terms specifically proscribing publication. If this Court applied the rule in *In re Berry,* 68 Cal.2d 137, 65 Cal.Rptr. 273, 436 P.2d 273 (1968), to the present case, a finding of unconstitutional vagueness or overbreadth would indeed preclude a judgment of contempt, whether or not petitioners subjectively felt that they were violating the injunction by publishing the advertisement. While petitioners urge that this Court adopt the *Berry* rule as the law of the case, such a course would be improper in this federal court proceeding. Nonetheless, the fact that petitioners might reasonably have relied on the *Berry* rule would be significant if they had acted in direct derogation of the injunction. *See* note 11, *infra.*

**11.** The Superior Court judge who heard the contempt proceeding stated that each petitioner had willfully violated the injunction. From the court's language, it appears that the finding of willfulness was based on the assumption that the publication ignored the injunction. *See* Memorandum Opinion at 10. If, as peti-

tioners urge, the injunction could not constitutionally apply to their conduct, they could not through publication have engaged in willful violation. Again, it must be stressed that this situation is different from that in which one willfully violates a clearly applicable injunction on the ground that it is unconstitutional.

**12.** It might be noted, however, that even assuming that the rule discussed above has acquired the stature of a federal rule, it is by no means clear that it would apply to the present case. Resolution of the issue would necessitate consideration of questions including: (1) whether the contempt was civil or criminal and, if it was civil, whether the rule applies to such cases (*see United States v. United Mine Workers,* 330 U.S. 258, 295, 67 S.Ct. 677, 91 L.Ed. 884 (1947); Dobbs, *Contempt of Court: A Survey,* 56 Cornell L.Rev. 183, 235 (1971); *cf. United States v. Dickinson,* 465 F.2d 496, 509 (5th Cir. 1972)); (2) whether petitioners mounted a good faith concurrent challenge to the order's constitutionality and, if so, whether the rule should nonetheless apply (*see United States v. United Mine Workers, supra,* at 303, 67 S.Ct. 677; *see also United States v. Dickinson, supra,* at 511 (suggesting disregard for order justified if inadequate remedies for orderly review or if obedience would require irretrievable surrender of constitutional rights); *cf. United States v. Ryan,* 402 U.S. 530, 532 n.4, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971); *Maness v. Meyers,* 419 U.S. 449, 458–460, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975)); (3) whether the rule should apply when the state rule allows disregard of an unconstitutional injunction and petitioners thus lack notice that they cannot bypass judicial review (*cf. Walker v. City of Birmingham,* 388 U.S. 307, 319–320, 87 S.Ct. 1824,

### C.

The only remaining question then, and the one dispositive of these petitions, is whether the injunction could be constitutionally applied to the publication of the advertisement, the language of which the state court found to constitute a "hortatory declamation" which compelled the "inference" that the petitioners were "abetting and advising the striking unions and others to ignore the court orders and escalate their efforts". (Memorandum Opinion at 10–11.)

First Amendment freedoms are deemed "delicate and vulnerable, as well as supremely precious in our society". *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963); *Walker v. City of Birmingham, supra,* 388 U.S. at 347–348, 87 S.Ct. 1824 (Brennan, J., dissenting). Accordingly, speech may be restricted only in certain narrowly circumscribed instances. The necessity for stringent protection is enhanced in the present case because there are two separate and substantial First Amendment interests at stake: the interest of the petitioners in airing their views, and the public's interest in being informed. *See, e. g., New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). With reference to the latter, the Supreme Court has emphasized that "[t]he public interest in having free and unhindered debate on matters of public importance [is] * * the core value of the Free Speech Clause of the First Amendment * * *". *Pickering v. Board of Education,* 391 U.S. 563, 573, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968); *cf. City of Madison v. Wisconsin Employment Relations Commission,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976). In *Pickering,* the Court observed that teachers (the public employees concerned there) were the most likely to have informed opinions about spending funds allotted to schools. 391 U.S. at 572, 88 S.Ct. 1731. Similarly, the opinions of petitioners here must be deemed particularly valuable to the public.

■ The Supreme Court has articulated the standard for regulating speech. For the injunction here to apply to the advertisement,[13] and thus to justify a finding of contempt, the court was required to find that the speech involved was "directed to inciting or producing imminent lawless action and * * * likely to incite or produce such action". *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969); *see Healy v. James,* 408 U.S. 169, 188, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Hess v. Indiana,* 414 U.S. 105, 108, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973); *Communist Party of Indiana v. Whitcomb,* 414 U.S. 441, 448–450, 94 S.Ct. 656, 38 L.Ed.2d 635 (1974).[14] In this light, the Court has emphasized the "rigorous constitutional standards that apply when government attempts to regulate expression" (*Erznoznik v. City of Jacksonville,* 422 U.S. 205, 217, 95 S.Ct. 2268, 2277, 45 L.Ed.2d 125 (1975) ), as well as the importance of "precision of drafting and clarity of purpose" in the realm of First Amendment rights. 422 U.S. at 217–218, 95 S.Ct. at 2277.

■ Also relevant to the issue of the unconstitutional *application* of the injunction to petitioners is the Supreme Court's decision in *Bridges v. California,* 314 U.S.

18 L.Ed.2d 1210 (1967) ); and (4) how to reconcile the apparent inconsistency between *Walker* and *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945).

If the rule did not apply, disregard of the injunction would be permissible only upon the further showing that the injunction, was vague and/or overbroad.

13. Any distinctions for First Amendment purposes between advertisements and other speech are inapplicable here because the advertisement at issue was of a noncommercial nature.

14. The California Supreme Court in *In re Berry,* 68 Cal.2d 137, 65 Cal.Rptr. 273, 436 P.2d 273 (1968), assumed *arguendo,* without finding, that public employee strikes are illegal and assumed again that publication of articles and distribution of literature could be enjoined insofar as they advocated a strike. 68 Cal.2d at 154, 65 Cal.Rptr. at 285, 436 P.2d at 285. Such statements were simply *dicta,* and assumed *dicta* at that. Moreover, to the extent that the court was referring to mere advocacy, the subsequent decision in *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), is to the contrary.

252, 62 S.Ct. 190, 86 L.Ed. 192 (1941). Bridges had been cited for contempt for the publication of a telegram he had sent to the Secretary of Labor referring to a court decision as "outrageous" and stating that the union did "not intend to allow state courts to override the majority vote of members * * * and * * * the National Labor Relations Board". 314 U.S. at 276, 62 S.Ct. at 200. That case is distinguishable from the present one, most significantly because the Court found there, and the parties did not dispute, that neither the general law of California nor the court decree which Bridges called "outrageous" prohibited a strike. 314 U.S. at 278, 62 S.Ct. 190. Nonetheless, the decision emphasizes the strictness of the standards which must be met before speech or the press can be restricted. Reviewing the "clear and present danger" cases, Justice Black concluded that what ultimately emerged from them was:

"* * * a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished. Those cases do not purport to mark the furthermost constitutional boundaries of protected expression, nor do we here. They do no more than recognize a minimum compulsion of the Bill of Rights." 314 U.S. at 263, 62 S.Ct. at 194.

The more recent *Brandenburg* standard is even more stringent than that in *Bridges,* as it requires not only imminence and likelihood of the evil, but also an element of intent, as the speech must be "directed to" inciting or producing imminent lawless action. Together, the decisions in *Brandenburg* and *Bridges* point to the inadequacy of the court's finding in the contempt proceeding.

The advertisement here in question simply urged the Board of Supervisors to negotiate by engaging in collective bargaining. The finding that it was a "hortatory declamation * * * abetting and advising" disregard for court orders and escalation of strike effects is questionable at best. However, assuming the finding is supported by the evidence, petitioners' publication may reasonably be seen as mere advocacy of lawlessness. At most, it can be viewed as directed toward producing imminent lawless action. In either case, the *Brandenburg* standard is not met as the finding makes no mention of the likelihood that the publication would effect the result supposedly intended, nor does the record indicate such likelihood.

Thus, this Court is constrained to find that regardless of its facial validity *vel non,* the injunction could not constitutionally be applied to the publication in question. The contempt judgment based on petitioners' supposed violation of the injunction must, therefore, be held impermissible.

Petitioners will prepare and file a judgment approved as to form by defendants on or before February 1, 1977.