11-3061-cv
State Employees Bargaining Agent Coalition v. Rowland

**UNITED STATES COURT OF APPEALS**
FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: August 27, 2012     Decided: May 31, 2013)

Docket No. 11-3061-cv

STATE EMP BARGAINING AGENT COALITION, IND & O/B/O ALL OF ITS MEMBERS, CONNECTICUT  ASSOCIATION OF PROSECUTORS, CONGRESS OF CT COMMUNITY COLLEGES, SEIU, AFLCIO, JUDICIAL MARSHALS, INTL BROTHERHOOD OF POLICE OFFICERS, CONNECTICUT STATE UNIVERSITY AMERICAN ASSOC. OF UNIVERSITY PROFESSORS, PROTECTIVE SVC COALITION, IAFF, AFLCIO, NATIONAL ASSN OF GOVT EMP, AFLCIO, CONNECTICUT STATE EMPLOYEES ASSOCIATION, SEIU, AFL-CIO, CONNECTICUT EMPLOYEES UNION INDEPENDENT, SEIU, AFLCIO, DISTRICT 1199, NEW ENGLAND HEALTH CARE EMPLOYEES UNION, SEIU, AFL-CIO, COUNCIL 4, AMER FEDERATION OF STATE, COUNTY, MUNICIPAL EMP, AFL-CIO, DENISE A. BOUFFARD, IND & O/B/O ALL OTHERS SIMILARLY SITUATED, GENEVA M. HEDGECOCK, IND & O/B/O ALL OTHERS SIMILARLY SITUATED, DENNIS P. HEFFERNAN, IND & O/B/O ALL OTHERS SIMILARLY SITUATED, WILLIAM D. HILL, IND & O/B/O ALL OTHERS SIMILARLY SITUATED, MARCELLE Y. PICHANICK, IND & O/B/O ALL OTHERS SIMILARLY SITUATED, AMERICAN FEDERATION OF SCHOOL ADMINISTRATORS, LOCAL 61, AFLCIO, CONNECTICUT STATE POLICE UNION, CONNECTICUT FEDERATION OF EDUCATION & PROFESSORS EMPLOYEES AFT, AFL-CIO,

*Plaintiffs-Appellants*,

UNIVERSITY OF CONNECTICUT, AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,

*Plaintiff*,

v.

JOHN G. ROWLAND, I/O AS GOV. OF THE STATE OF CONNECTICUT, MARC S. RYAN, I/O AS SEC OF OFC OF POLICY & MANAGMENT OF STATE OF CONNECTICUT,

*Defendants-Appellees*.[*]

---

[*] The Clerk of the Court is directed to amend the official caption in the case to conform to the caption listed above.

B e f o r e:

RAGGI, LYNCH and CHIN, *Circuit Judges*.

_____

Plaintiffs-appellants appeal from a decision of the United States District Court for the District of Connecticut (Alfred V. Covello, *Judge*) granting summary judgment for defendants and dismissing plaintiffs' federal constitutional law claims. We conclude that plaintiffs have made out a claim that defendants violated their First Amendment right to freedom of association by targeting union employees for firing based on their union membership. We therefore REVERSE the district court's grant of summary judgment to defendants and REMAND to the district court with instructions to GRANT summary judgment to plaintiffs on their First Amendment claim and to craft appropriate equitable relief. We also REVERSE the district court's dismissal on the pleadings of plaintiffs' claims against defendants in their individual capacities and REMAND those claims for further proceedings consistent with this opinion.

_____

DAVID S. GOLUB (Jonathan M. Levine, *on the brief*), Silver Golub & Teitell LLP, Stamford, Connecticut, *for Plaintiffs-Appellants*.

DANIEL JOSHUA KLAU (Bernard E. Jacques, *on the brief*), McElroy, Deutsch, Mulvaney & Carpenter, LLP, Hartford, Connecticut, *for Defendants-Appellees*.

_____

2

GERARD E. LYNCH, *Circuit Judge*:

Plaintiffs-appellants, labor organizations and state employees, brought this action in the United States District Court for the District of Connecticut (Alfred V. Covello, *Judge*), contending that defendants-appellees state officials violated their First Amendment right to freedom of association by discriminatorily laying off only union members when reducing the state's work force. The district court granted summary judgment to defendants in their official capacities based on a stipulated factual record and dismissed plaintiffs' claims; the court also dismissed plaintiffs' claims against defendants as individuals on the pleadings (defendants not having joined the stipulation in their individual capacities). We conclude that, on the stipulated facts, defendants violated plaintiffs' rights by targeting union employees for firing based on their union membership. We therefore REVERSE the district court's grant of summary judgment to defendants and REMAND to the district court with instructions to GRANT summary judgment to plaintiffs on their First Amendment claim and to craft appropriate equitable relief. We also REVERSE the district court's dismissal on the pleadings of plaintiffs' claims against defendants in their individual capacities and REMAND those claims for further proceedings consistent with this opinion.

## BACKGROUND

### I. Facts

The following facts are drawn from the parties' Joint Rule 56 Statement, in which defendants, in their official capacities, and plaintiffs stipulated to certain undisputed

material facts.[1]  Defendants did not stipulate to any of these facts in their individual capacities.

Plaintiff-appellant State Employees Bargaining Agent Coalition ("SEBAC") is a coalition of thirteen state public employee unions representing approximately 40,000 Connecticut state employees.[2]  SEBAC has been designated by Connecticut's Board of Labor Relations as the exclusive bargaining agent for its constituent unions for the purpose of negotiating and entering into a collective bargaining agreement ("CBA") covering certain terms of employment, including health care and pension benefits.  In 1997, SEBAC entered into a long-term CBA with Connecticut covering all of its constituent unions.  The constituent unions also had separate, union-specific CBAs that covered other terms of employment.  All of those CBAs were in effect in November-December 2002 and were scheduled to be in effect for a period of years thereafter.

At all times relevant to the complaint, defendant-appellee John G. Rowland was Governor of Connecticut, and defendant-appellee Marc S. Ryan was Secretary of Connecticut's Office of Policy and Management.  Rowland and Ryan ("defendants") are sued in both their official and individual capacities.  Defendants had responsibility under Connecticut law for managing Connecticut's work force and negotiating CBAs with state employees.

[1] The parties were offered the opportunity at oral argument to submit further stipulations.  As they could not agree on any further stipulations, we consider only the Joint Rule 56 Statement.

[2] In addition to SEBAC, plaintiffs-appellants include twelve of its thirteen constituent unions, and five former state employees and union members who were terminated by defendants in 2003.

4

In November 2002, defendants met with SEBAC and its constituent unions (together with the individual plaintiffs, "plaintiffs") and sought approximately $450 million in long-term concessions under plaintiffs' CBAs. At that time, the State of Connecticut employed approximately 50,000 individuals. Approximately 37,500 (75%) of these employees were members of SEBAC constituent unions, and approximately 12,500 (25%) were not union members.[3] Defendants advised plaintiffs that unless they agreed to these concessions, defendants would fire approximately 3000 unionized state employees. Although all state employees receive the same health care and pension benefits, defendants "intentionally directed their demands for health care and pension concessions (and their corresponding threats of termination if the concessions were not granted) solely to state union employees." Joint Local Rule 56(a)1 & 2 Statement ¶ 44.

Plaintiffs did not agree to all of the proposed concessions, but instead offered alternative concessions.[4] In December 2002, defendants ordered the firing of approximately 2800 unionized state employees. These firings were effectuated in 2003 (the "2003 firings") and were limited to unionized state employees. No non-union workers were fired. While the fired employees were told that they were being laid off due to economic necessity caused by the state's fiscal year 2003 budget deficit, the firings

---

[3] State employees are not required to belong to a union, and non-unionized employees occupy both non-management and management positions.

[4] Under Connecticut law, plaintiffs had a statutory right to refuse the proposed concessions. See Conn. Gen. Stat. § 5-272(c).

in fact "had minimal effect" on the state's fiscal year 2003 expenses,[5] and "were ordered as a means of trying to compel the plaintiff unions to agree to the concessions demanded." Id. ¶ 67. Defendants advised plaintiffs that the 2003 firings would be rescinded if plaintiffs agreed to the proposed concessions.

## II. Procedural History

Plaintiffs filed the instant action in Connecticut district court in February 2003 seeking damages against defendants in their personal capacities and injunctive relief against defendants in their official capacities. Plaintiffs filed an amended complaint in May 2003, alleging that the 2003 firings violated their rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution, as well as the Contract Clause.

Defendants moved to dismiss the amended complaint on, inter alia, legislative immunity and Eleventh Amendment sovereign immunity grounds. The district court held that: (1) sovereign immunity barred plaintiffs' claims for money damages, but not plaintiffs' claims for injunctive relief; and (2) further discovery was required to determine whether legislative immunity would bar plaintiffs' claims for injunctive relief. State Emps. Bargaining Agent Coal. v. Rowland, No. 03 Civ. 221, 2006 WL 141645 (D. Conn. Jan. 18, 2006). Defendants filed an interlocutory appeal.

---

[5] Indeed, some of the fired employees could not be fired until after the end of the 2003 fiscal year, or were in positions funded by private industry. Further, the financial concessions offered by plaintiffs for the 2003 fiscal year exceeded by millions of dollars the budget savings realized from the challenged firings. Moreover, it appears uncontested that whatever savings were accomplished by the 2003 firings could have been achieved by layoffs that affected union members and non-union employees equally.

On appeal, we largely affirmed the district court's holdings and sent the case back to the district court for discovery. State Emps. Bargaining Agent Coal. v. Rowland, 494 F.3d 71 (2d Cir. 2007). Plaintiffs then moved for reconsideration of the dismissal of the claims against defendants in their individual capacities, which the district court denied as untimely. Plaintiffs were granted class certification in March 2010.

In June 2010, the parties cross-moved for summary judgment as to liability, agreeing to brief remedial questions only after the resolution of liability issues. Plaintiffs sought summary judgment on the following claims: (1) that defendants violated plaintiffs' right to free association by (a) conditioning plaintiffs' right to continued public employment on their waiver of their right to join a union, (b) retaliating against plaintiffs for engaging in union activity and asserting union rights, and (c) targeting plaintiffs for layoff based on their union membership; (2) that defendants violated the Contract Clause by (a) conditioning plaintiffs' right to continued public employment on plaintiffs' waiver of their legislatively-approved contract rights under the CBA, and (b) retaliating against plaintiffs for refusing to give up these rights by ordering layoffs of plaintiffs in an effort to compel such a waiver; and (3) that defendants violated the Equal Protection Clause by targeting plaintiffs for layoffs based on their union membership.[6] Defendants moved for summary judgment on all claims, arguing that the district court should reject plaintiffs' "effort to transform a labor dispute into a constitutional case." Defs.' Mot. for Summ. J. 1 (emphasis omitted). As noted above, the parties submitted a Joint Rule 56 Statement, and stipulated that the facts therein would govern the cross-motions for summary judgment.

---

[6] Although plaintiffs' complaint also asserted substantive due process claims, plaintiffs did not seek summary judgment on these claims and have since abandoned them.

In June 2011 the district court denied plaintiffs' motion for summary judgment, granted defendants summary judgment, and entered judgment in favor of defendants. Plaintiffs now appeal: (1) the dismissal of their claims against defendants in their individual capacities; (2) the denial of their motion for reconsideration of this dismissal; and (3) the grant of summary judgment to defendants.

## DISCUSSION

We review a district court's grant of summary judgment de novo, see Nagle v. Marron, 663 F.3d 100, 104-05 (2d Cir. 2011), and will affirm only if, construing the evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). Here, there are no disputed issues of fact, as the parties expressly stipulated to the above facts as the basis for adjudicating the summary judgment motions.

## I.      First Amendment Claim

Plaintiffs allege that defendants violated their First Amendment right to freedom of association by targeting union employees for termination based on their union membership. Plaintiffs concede that defendants have the right to manage the size of the State's work force, and may lay off employees based on constitutionally-neutral determinations of work force needs and budgetary constraints. But plaintiffs argue that defendants cannot "single out members of a constitutionally protected group for termination unless defendants can establish a compelling interest for doing so, and that they utilized the least restrictive means to accomplish those ends," which they argue defendants have not done. Appellants' Br. 43 (citation omitted).

8

The right to free association is "a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." Shelton v. Tucker, 364 U.S. 479, 485-86 (1960); see also Smith v. Ark. State Highway Emps., 441 U.S. 463, 464 (1979) (noting that First Amendment protects the right of an individual to associate with others). "The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so." Smith, 441 U.S. at 465.

Included in this right to free association is the right of employees to associate in unions. See Thomas v. Collins, 323 U.S. 516, 534 (1945) (holding that the "rights of assembly and discussion" of a union and its members are protected by the First Amendment); see also Smith, 441 U.S. at 466 (holding that the First Amendment does not impose an affirmative obligation on government to recognize and bargain with a union, but suggesting that reasoning might be different if government had "tak[en] steps to prohibit or discourage union membership or association"). We ourselves have stated that it cannot "be questioned that the First Amendment's protection of speech and associational rights extends to labor union activities." Conn. State Fed'n of Teachers v. Bd. of Educ. Members, 538 F.2d 471, 478 (2d Cir. 1976); see also Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor, 642 F.2d 666, 670 (2d Cir. 1981) ("The First Amendment's protection of the right of association extends to labor union activities.").

However, we have never articulated a standard for determining whether, and under what circumstances, a public entity's employment decisions violate this right to associate

9

in unions. With respect to a public employee's right to associate with political parties, the Supreme Court stated in Rutan v. Republican Party of Illinois that government employers may not "condition[] hiring decisions on political belief and association . . . unless the government has a vital interest in doing so." 497 U.S. 62, 78 (1990); see also Branti v. Finkel, 445 U.S. 507, 520 (1980) (holding that termination of public defenders because they were not affiliated with Democratic Party violated First Amendment); Elrod v. Burns, 427 U.S. 347, 372-73 (1976) (holding that public employees who alleged they were discharged because they were not members of sheriff's political party stated a First Amendment claim); Keyishian v. Bd. of Regents, 385 U.S. 589, 609-10 (1967) (invalidating state university system's prohibition on membership in Communist Party). The Supreme Court was concerned that the government would "wield[] its power to interfere with its employees' freedom to believe and associate," Rutan, 497 U.S. at 76, and noted that "conditioning public employment on the provision of support for the favored political party 'unquestionably inhibits protected belief and association,'" id. at 69, quoting Elrod, 427 U.S. at 359. It therefore held that hiring based on political party affiliation was subject to strict scrutiny and must be "narrowly tailored to further vital government interests." Rutan, 497 U.S. at 74; see also Branti, 445 U.S. at 515-16 (requiring "an overriding interest of vital importance" to fire a public employee solely for his private beliefs (citation and internal quotation marks omitted)).

Conditioning public employment on union membership, no less than on political association, inhibits protected association and interferes with government employees' freedom to associate. It is therefore subject to the same strict scrutiny, and may be done

10

only "in the most compelling circumstances." Rutan, 497 U.S. at 76.  The Supreme Court suggested as much (albeit in dicta) in Smith, when it contrasted the state's refusal to recognize and bargain with a union, which did not implicate the First Amendment, with "taking steps to prohibit or discourage union membership or association," which would likely infringe on First Amendment rights.  441 U.S. at 466 ("Far from taking steps to prohibit or discourage union membership or association, all that the Commission has done in its challenged conduct is simply to ignore the union.  That it is free to do."); see also Collins, 323 U.S. at 532 (holding that government regulation of unions "must not trespass upon the domain set apart for free speech and free assembly").

Defendants argue that "[i]n terms of their impact on core political beliefs and association, layoffs based on union membership are not even remotely comparable to layoffs and hiring decisions based on political party affiliation."  Appellees' Br. 42.  But "the First Amendment does not protect speech and assembly only to the extent it can be characterized as political," United Mine Workers of Am. v. Ill. State Bar Ass'n, 389 U.S. 217, 223 (1967), and the Supreme Court's First Amendment jurisprudence has not distinguished between political parties and other associations.  In NAACP v. Alabama ex rel. Patterson, the Supreme Court held that "state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny," and that it is "immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters."  357 U.S. 449, 460-61 (1958).

Labor unions are well within this protection.  As the Supreme Court has stated, "the Constitution protects the associational rights of the members of the union precisely

11

as it does those of the NAACP." <u>Bhd. of R.R. Trainmen v. Virginia ex rel. Va. State Bar</u>, 377 U.S. 1, 8 (1964). Labor unions advocate the economic interest of their members, and historically, unions and their members have also been associated with political advocacy. Not only do unions engage directly in partisan electoral politics,[7] but labor unions have been predicated on ideas of worker solidarity that are as much political as economic.[8] Opposition to labor unions, similarly, has at times been based not only on the perceived economic interests of employers, consumers, and workers, but on the perception that unions advocate radical political ideas.[9]

Defendants cite <u>Elrod</u>'s assertion that "political belief and association constitute the core of those activities protected by the First Amendment," 427 U.S. at 356, as indicating that political association is different from union association. But in union cases, the Supreme Court has emphasized that "'[f]ree discussion concerning the

---

[7] This is particularly true of public employee unions. Since the wages of public employees bear directly on the overtly political issue of state budgets, including the appropriate levels of public expenditure and taxation, the "economic" advocacy of public employee unions touches directly on matters of political concern. <u>Cf</u>. <u>Knox v. Serv. Emps. Int'l Union, Local 1000</u>, 132 S. Ct. 2277, 2289 (2012) (recognizing that "a public-sector union takes many positions during collective bargaining that have powerful political and civic consequences").

[8] Indeed, there is evidence that unions favor certain parties over others. <u>See</u>, <u>e.g.</u>, Thomas L. Brunell, <u>The Relationship Between Political Parties and Interest Groups: Explaining Patterns of PAC Contributions to Candidates for Congress</u>, 58 POL. RES. Q. 681, 687 (2005) (concluding that labor groups "direct substantially higher proportions of their money" to Democratic candidates).

[9] <u>See</u>, <u>e.g.</u>, <u>Fiske v. Kansas</u>, 274 U.S. 380 (1927) (reversing conviction of organizer of the Industrial Workers of the World for criminal syndicalism, based on references to class struggle in the union's constitution).

12

conditions in industry and the causes of labor disputes'" is "'indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society.'" Collins, 323 U.S. at 532, quoting Thornhill v. Alabama, 310 U.S. 88, 103 (1940). Further, even if the Rutan/Elrod rule extended only to political organizations, which we have noted above it does not, it would not be easy to classify public-sector unions as falling outside the universe of political organizations, given the Supreme Court's recognition that their collective bargaining positions necessarily "have powerful political and civic consequences." Knox, 132 S. Ct. at 2289. Indeed, Knox effectively precludes defendants from arguing that cases holding it unconstitutional to fire or refuse to hire union members are distinguishable because defendants here acted not out of hostility to union membership per se, but as a tactic to put pressure on the union in labor negotiations. As Knox recognizes, a public employee union's positions on wages effectively are positions on public policy. Defendants' attempt to place this case outside the Rutan line of cases is therefore unavailing.

Given the well-established principle that union activity is protected by the First Amendment, and the applicability of the reasoning in the political patronage cases to union membership, we hold that Rutan's heightened scrutiny requirement applies to employment decisions based on union membership.[10] As defendants concede that they

---

[10] Other circuits have also recognized a First Amendment cause of action for firings based on union membership. In an opinion cited favorably by the Supreme Court in Smith, 441 U.S. at 464-65, the Seventh Circuit stated that "the courts . . . have accepted a general proposition that public employees cannot be discharged for engaging in 'union activities,'" and held that "a discharge because of union membership" violates "the general constitutional right of free association," as there is "no reason to distinguish a union from any other

13

intentionally fired only union members in 2003,[11] we now examine whether the terminations were "narrowly tailored to further vital government interests."[12] Rutan, 497 U.S. at 74.

Defendants argue that the State needed to reduce the cost of its work force, and that since plaintiffs refused the proposed CBA concessions defendants were forced to lay off union workers to do so. But the stipulated facts make clear that the 2003 firings were not tailored to reduce the cost of the State's work force. To the contrary, defendants have

---

association." Hanover Twp. Fed'n of Teachers v. Hanover Cmty. Sch. Corp., 457 F.2d 456, 460 (7th Cir. 1972); see also McLaughlin v. Tilendis, 398 F.2d 287, 289 (7th Cir. 1968) ("Unless there is some illegal intent, an individual's right to form and join a union is protected by the First Amendment."). The Eighth and Tenth Circuits have also acknowledged such a cause of action. See Lontine v. VanCleave, 483 F.2d 966, 967-68 (10th Cir. 1973) (holding that sheriff's deputy had "a First Amendment right to participate and retain membership in a union," and "could not be suspended or dismissed for the exercise of his constitutional rights"); Am. Fed'n of State, Cnty., & Mun. Emps. v. Woodward, 406 F.2d 137, 139 (8th Cir. 1969) (holding that city could not fire employees because they joined a labor union, as "[u]nion membership is protected by the right of association under the First and Fourteenth Amendments").

[11] Defendants, perhaps recognizing the difficulty of their legal position, attempted at oral argument to parse the stipulation as not conceding that they laid off only union members. However, the stipulation clearly and unambiguously acknowledges that "[t]he terminations . . . were limited to unionized state employees." Joint Local Rule 56(a)1 & 2 Statement ¶ 53.

[12] Defendants argue as a preliminary matter that the targeting claim "as argued on appeal bears virtually no resemblance to the claim as presented below," where it was "a minor factual variation on the retaliation theme." Appellees' Br. 39. To the extent that defendants make a waiver argument, it is without merit, as plaintiffs clearly made the targeting claim in the summary judgment briefing below. Plaintiffs' motion for partial summary judgment argued that "[e]ven if not motivated by an impermissible intention to compel concessions of plaintiffs' collectively-bargained contract rights, defendants still violated plaintiffs' First Amendment rights by making layoff determinations based solely on the employees' union membership," and cited cases such as Woodward and Tilendis in support. Mem. in Supp. of Pls.' Mot. for Partial Summ. J. 29-30.

14

stipulated that the 2003 firings "had minimal effect on the State's [fiscal year 2003] expenses," and that the savings realized from the 2003 firings did not correlate to the concessions requested from the unions. Joint Local Rule 56(a)1 & 2 Statement ¶ 67. Indeed, the 2003 firings were not included in Rowland's "Balanced Budget Plan," which was issued at the same time that the layoffs were ordered, with the purpose of eliminating the State's budget deficit. Id. ¶ 72.

More importantly, defendants have not shown why the State's fiscal health required firing only *union members*, rather than implementing membership-neutral layoffs. Defendants have stipulated that all state employees, whether or not they belong to unions, receive the same health care and pension benefits. Nothing in the stipulation provides any support for an argument that union members cost more, provided fewer services, or were distinguishable from their non-union coworkers in any way other than their membership itself. Defendants chose to accomplish whatever cost savings were achieved by firing only employees who were union members, as opposed to targeting the least valuable or most expensive workers. Thus, layoffs predicated on union membership could not differentially affect the savings to be achieved, or the efficiency of the state's work force.

Defendants' best argument is that the 2003 firings were meant to compel the unions to agree to concessions, which in turn would reduce the long-term costs of state government, arguably a vital government interest. But while plaintiffs have stipulated that the 2003 firings were "based on Rowland's determination of what it would take to compel the plaintiff Unions to agree to the demanded concessions," Joint Local Rule

15

56(a)1 & 2 Statement ¶ 49, defendants have offered no evidence of narrow tailoring. State officials may certainly bargain hard with state employees. Indeed, as recognized in Smith, a state need not recognize or bargain collectively with employee unions at all. 441 U.S. at 466. But for a state to fire union members – and union members alone – in the hope of ultimately achieving economic concessions is little different from refusing to hire union members in the first place. Unquestionably, layoffs applied generally without discriminating against union members would also have brought dramatic pressure on SEBAC, by terminating the employment of workers on whose behalf the unions were negotiating; this is particularly so in that 75% of such layoffs could be expected to fall on union members, who made up that proportion of the work force. But such layoffs, in contrast to the ones here challenged, would not have penalized employees because of their union membership. As the Supreme Court noted in Elrod, "conditioning the retention of public employment on the employee's" association with a certain group "must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." 427 U.S. at 363. Defendants have made no such showing here to justify terminating only union employees.

As plaintiffs have shown that defendants fired employees based on their union membership without narrowly tailoring the terminations to a vital government interest, plaintiffs were entitled to summary judgment on their First Amendment targeting claims. Because defendants are liable under plaintiffs' targeting theory, we need not reach

16

plaintiffs' alternative First Amendment retaliation theory.[13] We thus reverse the district court's grant of summary judgment to defendants, and remand with instructions to the district court to grant summary judgment to plaintiffs on liability and craft appropriate equitable relief.

## II. Dismissal of Defendants In Their Individual Capacities

Plaintiffs also appeal the district court's dismissal on sovereign immunity grounds of their claims against defendants in their individual capacities. While acknowledging that the Eleventh Amendment generally does not bar claims for monetary damages against state officials in their individual capacities, the district court nonetheless held that plaintiffs' claims were barred because the action, "though nominally against the Governor

---

[13] Plaintiffs also allege that their termination was in retaliation for their speech on matters of public concern, proscribed by Pickering v. Board of Education, 391 U.S. 563 (1968). We believe that the case is better conceptualized under Rutan. We have noted that "for the Pickering line of cases to apply, there must be an expression of views." Morin v. Tormey, 626 F.3d 40, 43 (2d Cir. 2010). Plaintiffs have not identified any expression of views by the laid-off workers, but instead allege that defendants retaliated against them because they refused defendants' proposed concessions. Similar to the plaintiff in Morin, plaintiffs here "did not initiate the expression of any views, nor did [they] volunteer comments on any issues, whether of public or private citizen concern. [They] just said, 'No.'" Id. at 44. "In short, the issue in this case is whether [plaintiffs] could be retaliated against based on" their union "affiliation (or non-affiliation), not whether [they] could be retaliated against based on any protected speech," and the case is therefore "plainly governed by the Elrod/Branti/Rutan trilogy." Id.; see also McEvoy v. Spencer, 124 F.3d 92, 98 (2d Cir. 1997) (distinguishing cases in which a public employer takes adverse action against an employee on the basis of the employee's political affiliation, which is governed by the Elrod/Branti/Rutan line of cases, from those in which the basis for adverse action was the employee's speech, which are governed by the Pickering line of cases).

As defendants are liable under Rutan, we need not decide whether they might also be liable under Pickering. For the same reason, we need not address plaintiffs' arguments that the 2003 firings also violated the Equal Protection Clause of the Fourteenth Amendment and the Contract Clause.

17

and the Secretary of OPM," was in reality a suit against the State, as a damages award would cause "the loss of substantial public resources." Rowland, 2006 WL 141645, at *5.

The district court erred. Where a complaint "specifically seeks damages from [] defendants in their individual capacities[,] . . . the mere fact that the state may reimburse them does not make the state the real party in interest." Berman Enters., Inc. v. Jorling, 3 F.3d 602, 606 (2d Cir. 1993). That is true even if the award is quite large, as we noted in Huang v. Johnson, where the plaintiffs sought a $50 million award. 251 F.3d 65, 70 (2d Cir. 2001) (holding that the fact that defendants "might not be able to pay [the award] on their own [did] not transform the claim into one against [defendants] in their official capacities"). We therefore hold that the claims for monetary damages against the defendants in their individual capacities are not barred by the Eleventh Amendment.

Defendants argue that even if sovereign immunity is unavailable, the dismissal should still be upheld on qualified immunity grounds.[14] "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutor[y] or constitutional rights of which a reasonable person would have known." Fabrikant v. French, 691 F.3d 193, 212 (2d Cir. 2012), quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).

_____

[14] The district court did not rule on qualified immunity, as the issue was mooted by its sovereign immunity ruling. Rowland, 2006 WL 141645, at *5.

The claims against defendants as individuals stand in a different procedural posture than those against defendants in their official capacities. As defendants did not join the stipulated set of facts in their individual capacities, and the dismissal of the defendants as individuals was granted on a Rule 12(b)(6) motion to dismiss the complaint, we must assume that the factual allegations of plaintiffs' amended complaint are true for the purposes of our qualified immunity inquiry. The amended complaint – as distinct from the stipulated facts agreed to by both sides for purposes of the summary judgment motion – asserts claims not addressed by the stipulation, alleging, among other things, that the 2003 firings were also motivated by Rowland's desire to retaliate against unions that had opposed him in the 2002 gubernatorial election. As noted above, at the time of defendants' actions it was clearly established that firing employees based "on political belief and association plainly constitute[d] an unconstitutional condition," unless the employer showed that he had "a vital interest in doing so." Rutan, 497 U.S. at 78; see also Vezzetti v. Pellegrini, 22 F.3d 483, 486-87 (2d Cir. 1994) (holding that "First Amendment rights are violated when a person holding a nonpolicymaking position is dismissed from employment for political reasons"). As defendants have not proffered a vital interest in terminating employees as political retaliation, qualified immunity is unavailable at the pleading stage, which is as far as this litigation has progressed against defendants as individuals. We express no view on whether such immunity may prove applicable at a later stage of the litigation.

19

**CONCLUSION**

Accordingly, for the reasons stated above, we reverse the district court's grant of summary judgment to defendants in their official capacities, and direct that summary judgment on liability be awarded to plaintiffs. We also reverse the district court's dismissal of defendants in their individual capacities. The case is remanded to the district court to craft appropriate equitable relief, and for other proceedings consistent with this opinion.